[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON TERMINATION OF PARENTAL RIGHTS
On June 17, 1991, the Department of Children and Youth Services ("DCYS") filed a petition to terminate the parental rights of Teresa G. and Thomas G., the biological parents of Shannon G., their daughter, who was born on May 5, 1988. The petition alleges, as to both parents, the four grounds pursuant to section 17a-112 of the Connecticut General Statutes:
(1) Abandonment, in that the parents failed to CT Page 2207 maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child;
(2) failure of the parents to achieve such a degree of personal rehabilitation after an adjudication of neglect has been made in a prior proceeding as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child;
(3) the denial by reason of act or acts of commission or omission, of the care, guidance or control necessary for her physical, educational, moral or emotional well-being; and,
(4) there is no ongoing parent-child relationship as defined by law.
At the initial pleas hearing held on July 10, 1991, the court found that both parents had been properly served. The mother appeared, the court appointed counsel for her, and she entered a denial to the allegations in this petition. The father failed to appear and was therefore defaulted. The court ordered a psychological evaluation on the mother and a parent-child interaction study. After the evaluations were filed with the court, a status conference was held and the case was then set down for trial on January 13 and 14, 1992. The clerk gave the respondent mother written notice of these trial dates. The respondent mother failed to appear for trial on January 13. Her attorney was present and advised the court that she had written her client to contact her to prepare for the trial. She had also tried, with no success, to reach her client by telephone.
The trial began on January 13, and DCYS called the following witnesses: Ms. Claire Sansone, the social worker assigned to this case; Michael Parnell, M.S.W., a drug counselor at Danbury Hospital; Mark D. Simms, M.D. a pediatrician; Robert S. Colen, Ph.D., a licensed child psychologist; Ms. Mary Burke, the foster mother; and Ms. Linda Newby, a parent-aide from the Danbury Commission for Child Care, who was assigned to assist this mother. DCYS introduced as exhibits, without objection from counsel for the mother or the child, the following documents:
State's Exhibit A — alcohol evaluation by Michael Parnell of Danbury Hospital, dated January, 30, 1991;
State's Exhibit B-1 B-2 — evaluations of Dr. Mark D. Simms, dated October 30, 1990 and June 11, 1991; CT Page 2208
State's Exhibit C — photograph of the child, Shannon;
State's Exhibit D — four DCYS treatment plans;
State's Exhibit E — three DCYS service agreements with the mother, all prepared by Ms. Sansone, DCYS social worker;
State's Exhibit F — Ms. Sansone's letter to the mother's attorney suspending visitation with the child; and,
State's Exhibit G-1 and G-2 — the social study and addendum filed by Ms. Sansone with the petition for termination.
DCYS must prove at least one of these four grounds, by clear and convincing evidence which has existed for at least one year, unless waived by the court under section 17a-112(c) of the Connecticut General Statutes.
By statutory definition, termination of parental rights means "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption. . . ." Section 17a-93(e) of the Connecticut General Statutes. It is a most serious and sensitive judicial action. In re Juvenile Appeal (Anonymous), 181 Conn. 638, 436 A.2d 290 (1980). "`Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children `undeniably warrants deference and, absent a powerful countervailing interest, protection.'" In re Juvenile Appeal (Anonymous),177 Conn. 648, 671, 420 A.2d 875 (1979). The standard of proof in an action to terminate parental rights is clear and convincing evidence, or as sometimes stated, clear and positive proof. Section 17a-112(b) of the Connecticut General Statutes. In re Juvenile Appeal (84-BC), 194 Conn. 252,255; In re Theresa S., 196 Conn. 18, 24, n. 5; In re Juvenile Appeal (83 BC), 189 Conn. 66, 72; In re Juvenile Appeal (84-6), 2 Conn. App. 705, 708, cert. denied,195 Conn. 801. See also Santosky v. Kramer, 455 U.S. 745,747-48. Section 1049 of the Connecticut Practice Book states: "The allegations of an application to terminate parental rights shall be proved by clear and convincing evidence." Clear and convincing evidence has been described as a level of proof that lies between the usual civil requirement of a fair preponderance of the evidence and the criminal standard of beyond a reasonable doubt. Cookson v. CT Page 2209 Cookson, 201 Conn. 229, 234. Proof by clear and convincing evidence means proof of a quality that is sufficient to convince the court beyond an average certainty that the respondents' rights as a parent should be ended. In re Juvenile Appeal (84-3), 1 Conn. App. 463, 468. The petitioner is required to prove only one of the grounds alleged by clear and convincing evidence in order to prevail on the petition. In re Juvenile Appeal (84-3), supra, 463, cert. denied, 193 Conn. 802.
A petition for the termination of parental rights consists of two phases, the adjudicatory phase and the dispositional phase. Connecticut Practice Book, Sec. 1042, 1044, 1059. There is no requirement that the adjudicatory phase and the dispositional phase should be held in different hearings; rather, a unified hearing is permissible. In re Juvenile Appeal (84-AB), 192 Conn. 254, 259 (1984). There is a different purpose for each of the two phases. In the adjudicatory phase, the court receives evidence to determine the validity of the allegations made in the petition, and the court is limited in receiving evidence to the events that occurred prior to the filing of the petition. The dispositional phase takes into account the best interests of the child, and the court is permitted to take into consideration events which had occurred after the filing of the petition to the time of trial.
Adjudicatory Phase: The court will consider the relevant and material evidence and find facts from the date DCYS received its first referral in June, 1989 to the date this TPR petition was filed on June 17, 1991. Further findings of fact will be made from the date of the petition to the time of trial in the dispositive phase of this decision.
Some background facts are not in dispute. According to the social study filed with the petition, DCYS first became involved with this respondent mother on June 22, 1989, when she was admitted to the Danbury Hospital detox unit for having used cocaine. At that time, she left her thirteen month old child with a friend who returned the child to her after she was discharged from the hospital. On July 21, 1989, DCYS provided her with a parent aide while she was living with a friend. She lived with various friends and relatives until November 22, 1989 when she and her child were homeless and moved into the Salvation Army Shelter in Danbury. On December 4, 1989, she was arrested by the Danbury Police at a local motel for risk of injury to this minor child. The police found this mother and the child in a motel room with five other persons all drinking alcohol. CT Page 2210 According to the police report, Shannon, now about seventeen months old, was found sitting on the floor next to a bed where two older men were laying naked. On that date, December 4, 1989, the mother signed a voluntary written consent for DCYS to place the child in foster care. In January 1990, the DCYS social worker prepared the first treatment plan that required this mother to take the following actions before she could be reunited with Shannon:
(1) obtain drug and alcohol treatment;
(2) obtain employment and suitable housing; and,
 (3) attend supervised weekly visitations with her daughter as arranged by DCYS.
DCYS also provided her with medical coverage, foster care for Shannon, and a parent aide.
On February 5, 1990, she entered denials to the neglect petition, and at that time the court ordered a drug and psychological evaluation of the mother. The order of temporary custody remained in effect by agreement. On August 27, 1990, the child was adjudicated neglected and uncared for by this court and committed to DCYS for eighteen months.
A. FAILURE TO REHABILITATE
The court will first consider the second ground DCYS has alleged for termination, failure of a parent to personally rehabilitate after the child has been adjudicated neglected in a prior proceeding by this court. It is defined in section 17a-112(b)(2) of the Connecticut General Statutes as a parent's failure "to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child." Section 17a-112(b)(2) of the Connecticut General Statutes. This statutory ground now requires that a parent rehabilitate within a "reasonable time," and "the age and needs of the child," which words were added as amendments to this statute effective October 1, 1983. Formerly, there was no time set for the parent to regain a responsible position in the child's life. In re Rayna M., 13 Conn. App. 32. The general effect of this change was to reduce the time for the parent to reform his or her behavior and for the court to also consider the needs and the age of the child. This child has a vital interest to develop her life constructively within a reasonable time and is equal to giving the parent a reasonable time to rehabilitate. What is a reasonable time CT Page 2211 is a question of fact to be governed by the circumstances in each case, and the age and needs of the child is another question of fact for the court to decide in this particular case. In re Shannon S., 19 Conn. 20 (1989), and In re Luis C., 210 Conn. 157 (1989).
It was on December 4, 1989, when Shannon was only nineteen months old, that her mother voluntarily agreed with DCYS to have her child placed in foster care. On January 1, 1990, she discussed this with the DCYS social worker, Ms. Sansone, and agreed to participate in a treatment program for her alcohol and drug addiction, obtain suitable housing and employment and attend supervised visitations at DCYS. She agreed to these same requirements in three subsequent DCYS plans through June 28, 1991 (State's Exhibit D, 1, 2, 3 and 4). She also agreed to substantially the same requirements in three service agreements with DCYS. (State's Exhibits E 1, 2 3.) The court ordered psychological was prepared by Dr. Welsh and filed on February 23, 1990. He found her to be alcohol-drug dependent, with a borderline personality disorder, and recommended she enter a treatment program. A second evaluation was completed by Ms. Sheila McConnon on August 7, 1990, which recommended a long term, inpatient, alcohol-drug treatment program. A third evaluation was completed on January 30, 1991 by Mr. Parnell, Alcohol Clinician at Danbury Hospital, who concluded she needed a minimum six month treatment program. She admitted to him drinking an average of two quarts of grain alcohol daily for the past seventeen years. From the testimony of Ms. Sansone and Mr. Parnell, the court finds that she refused to enter any alcohol-drug treatment program from January 1, 1990 to June 17, 1991, the date the termination petition was filed, a period of over seventeen months. By refusing treatment, she was unable to work or obtain suitable housing. She and the child received state assistance and lived with friends, relatives, or in homeless shelters during this same seventeen month period. The court finds that she failed to comply with all three of the requirements or expectations that she had agreed with DCYS to fulfill before she could be reunited with her daughter. To complicate her life further, she was arrested on August 2, 1990 for prostitution and subsequently served time in Niantic prison.
The age and needs of the child is another question of fact for the court to consider. When the mother agreed on December 4, 1989 to place her in foster care, Shannon was about nineteen months old. The foster mother testified that in the beginning she had frequent temper tantrums, banged her head on walls, masturbated, and was detached. Subsequently, she learned the alphabet, the meaning of words and to CT Page 2212 properly answer the telephone. During the seventeen months time period that this mother failed to reform her behavior, this child's behavior improved dramatically. The court must weigh this child's right to develop her life in a positive manner equally to a parent's right to rehabilitate and regain custody. After considering the young age and the special needs of this child, the facts are clear and convincing that this mother had failed to rehabilitate her life to provide for these needs. Shannon needs a stable parent to provide for her emotional and physical needs on a daily basis.
Based on these uncontraverted facts, the court finds that the evidence presented by DCYS was more than clear and convincing to prove this second ground, the failure of a parent to personally rehabilitate. Section 17a-112(b)(2) of the Connecticut General Statutes.
B. ABANDONMENT
The first ground alleged by DCYS in the TPR petition is abandonment, which is defined in section 17a-112(b)(1) as a parent's failure "to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. . . ." This definition changed the common law concept of abandonment when a permanent and total intent to abandon had to be proved. Litvaitis v. Litvaitis,162 Conn. 540, 547. In the case of In re Juvenile App. (Docket No. 9489), 183 Conn. 11, 14, 15 (1981), the Supreme Court stated that the focus to be considered is parental conduct, which is a question of fact for the trial court. In re Rayna, M., supra, 23. "The statutory standard is not whether the parents have shown some interest in their children. Common sense dictates that a parent's obligations toward his or her children go further than a minimal interest . . . . `The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.'" In re Rayna M., supra, 36, 37.
At various times during the past seventeen months, the mother expressed a desire or plan to care for her child, but has refused to accept treatment for her alcohol and drug addiction, has not secured housing or employment, and failed to enter counselling to improve her parenting skills. Action and positive conduct speak so much louder than words when it comes to meeting the daily needs of a three year old child. CT Page 2213 Her conduct, at best, showed a sporadic interest in Shannon and fell far below the statutory standard of maintaining a reasonable degree of interest, concern or responsibility as to the welfare of the child, or of the minimal requirements outlined in In re Rayna M., supra, 37. The father never acknowledged the child nor has he been involved with DCYS over this entire period, and his whereabouts have been unknown to the agency. The court finds from these facts that the evidence is clear and convincing that these parents have abandoned this child under this ground.
C. ACTS OF COMMISSION AND OMISSION
The third statutory ground alleged for termination was that by parental acts of commission or omission, this child has been denied the care, custody, or control necessary for his physical, educational, moral, or emotional well-being. Section 17a-112(b)(3) of the Connecticut General Statutes. The same evidence that proved the ground of failure to rehabilitate and abandonment can establish other grounds alleged in a petition. In re Shannon S., 19 Conn. App. 20
(1989). The same acts of parental omission proved on the first and second grounds would apply to the four requirements here that the child has been denied the care, custody or control for his physical, educational, moral and emotional well-being. The court finds that the evidence has been clear and convincing to prove this third ground.
D. NO ONGOING PARENT-CHILD RELATIONSHIP
The fourth and last ground was that there is no ongoing parent-child relationship, section 17a-112(b)(4) of the Connecticut General Statutes, which has two tests that the court must consider. First, that there is the absence of a relationship "that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child. . . ." And, second, that "to allow further time for the establishment . . . of such parent child relationship would be detrimental to the best interest of the child."
The respondent father had withdrawn totally from the child's life for over two years. There was no evidence to determine where he is living, or if he will ever return to see his child. The evidence is clear and convincing that there is no present parent-child relationship as to this father and to allow further time for it to develop would be detrimental to the child's best interests.
At first, the evidence as to the mother may indicate CT Page 2214 some positive feelings towards the child. The first test is met when a child has never known his mother, which is not the case here, or if a relationship had existed, it has been displaced. The proof of a displaced relationship depends on whether the child has specific memories and positive feelings for a natural parent. In re James T., 9 Conn. App. 608
(1987). The existence of such positive feelings depend upon the viewpoint of the child. In re Rayna M., supra. In reports by Dr. Mark D. Simms, dated October 30, 1990 and June 11, 1991, he states that the child does not appear to have a positive parental relationship and wishes to continue living with the foster parent. He concludes that the child's foster mother is now her psychological parent. The testimony of clinical experts is entitled to great weight in termination. In re Nicolina T., 9 Conn. App. 598, 607 (1987).
The court finds from the two evaluations of Dr. Simms, and from his and other testimony at trial, that this fourth ground of no ongoing parent-child relationship has been proved by DCYS by clear and convincing evidence as to both respondent parents.
The findings that the petitioners have proved all of the four grounds of the petition by clear and convincing evidence is not enough to warrant granting the termination of parental rights. Connecticut Practice Book, Sec. 1049. The court must also find again by clear and convincing evidence that it is in the best interests of the child, after the court considers the six factors set forth in section 17a-112(d) of the Connecticut General Statutes.
1. (Finding regarding the timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent.)
The father had failed to appear at any of the proceedings, his whereabouts have been unknown to DCYS since December, 1989; therefore, no services could be offered to him for reunification with this child.
On December 4, 1989, the mother voluntarily signed an agreement to give DCYS custody of Shannon and she was placed in foster care. The first DCYS treatment plan, dated January 1, 1990, required the mother to seek drug treatment, secure housing and employment and visit Shannon regularly. DCYS also provided medical coverage as well as parent aide services for visitation with her child. In the first service agreement the mother signed on February 21, 1990, these same expectations were outlined before she could be reunited with CT Page 2215 the child. Two additional service agreements were signed by the mother on June 25, 1990 and September 25, 1990. DCYS prepared three more treatment plans dated July 1, 1990, December 28, 1990 and June 28, 1991. For reasons only known to her, this mother has refused to comply with all treatment plans and service agreements prepared by DCYS.
2. (Finding regarding the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.)
Since the father has never appeared for any of the proceedings, no court orders have been directed to him. On February 5, 1990, the court ordered psychological and drug-alcohol evaluations on the mother. Dr. Ralph S. Welsh completed the psychological evaluation on February 23, 1990, and Michael Parnell, M.S.W., a drug counselor at Danbury Hospital, did the alcohol evaluation on January 30, 1991. Another drug evaluation was completed on August 7, 1990 by Sheila McConnon. Dr. Welsh's diagnoses were alcohol dependence, cocaine abuse, depressive disorder, and borderline personality disorder and suggested she enter a drug-alcohol treatment program. Mr. Parnell recommended a six month minimum alcohol treatment program. Ms. McConnon recommended a long term inpatient treatment drug-alcohol program. The mother never entered any of these recommended programs.
3. (Finding regarding the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.)
The child has never been with this father, therefore, she has no emotional ties to him. Shannon has been with the same foster parent for the past two years and she is now three years eight months old. When Shannon was first placed with her, the foster mother testified that she did not talk much, had temper tantrums constantly, masturbated, rocked herself and banged her head. After about ten months with her, this behavior has improved dramatically. The child now knows the meaning of words, the alphabet, is able to answer the telephone properly. She is enrolled in a church bible group for children of her age and is registered to attend the Head Start school program. She and her family love Shannon and this child has responded with love for them. At the beginning of these supervised visits with the mother at the CT Page 2216 DCYS offices, the child would have screaming fits and nightmares for two or three days thereafter. Now, she sees her mother and does not suffer serious negative reactions from the visits. Dr. Mark D. Simms, a pediatrician and expert in child development, filed two reports on Shannon's development, the first dated October 30, 1990 and the second dated June 11, 1991. He concludes that the foster mother is now her psychological parent. Even though the child has visited and knows her natural mother, this child is bonded to the foster mother. During these latest visitations, she needs the assurance of being returned to the foster mother's home. Dr. Simms strongly recommended that DCYS proceed with termination proceedings. Shannon is emotionally bonded to her foster parent and has shown remarkable progress there. According to the report of Robert S. Colen, Ph.D., dated December 6, 1991, Shannon's relationship with her mother is superficial and the foster mother is the child's psychological parent. (State's Exhibit I-1.)
4. (Finding regarding the age of the child.)
Shannon was born on May 5, 1988, therefore, she is three years and eight months old. Dr. Mark D. Simms, an expert in developmental pediatrics, testified that the child has an immediate need for a safe, permanent home that meets her emotional and physical needs on a daily basis. That home has been provided for her for the past two years by the foster mother and her family where they love and care for her each day. Dr. Simms stated that time is running out on Shannon and that it would be emotionally detrimental for her to further delay the decision for permanence in a safe, nurturing home. In his opinion, the child should be free for adoption to the present foster mother now. The court found his opinion compelling and probative evidence and in the best interests of the child.
5. (Finding regarding the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.)
The mother has failed to enter a drug-alcohol treatment program during the past two years rejecting the recommendations that she do so made by three expert CT Page 2217 clinicians, Dr. Welsh, Mr. Parnell and Ms. McConnon, whose reports are in evidence and in the court file. She failed to obtain employment and to cooperate with DCYS, and failed to report her whereabouts for long periods of time. She did not obtain housing for herself or the child from when the child was placed in emergency foster care in December, 1989 to June, 1991, living in homeless shelters and motels most of the time. She cancelled or did not come for twenty out of fifty-two visitations scheduled by DCYS, and from February to June, 1991 she made only about one-half of those scheduled visits. In August, 1990, she was arrested for prostitution and served jail time in Niantic Prison. In June, 1990, the mother found the foster home and went there several times causing disruption that required the police to ensure the safety of the child and the foster parents and for which visitations were suspended by DCYS. She threatened to kidnap the child from her. The only time she recognized Shannon's birthday with a birthday cake and gifts was in May, 1991. As previously stated, she chose to ignore the service agreements and treatment plans prepared for her to reunite with Shannon. She continued to lead a nomadic lifestyle without finding employment, housing, or enter a drug-alcohol treatment program. Robert S. Colen, Ph.D. concluded, in his evaluation of November 30, 1991 of this mother, that it is highly unlikely for her to make changes in her behavior to parent Shannon nor will she in the near future be able to meet her emotional and physical needs. He states in this report that her immaturity, poor ability to modulate her emotions, and poor judgment suggests that she will intermittently have difficulty functioning in the community. (See State's Exhibit I-1.)
6. (Finding regarding the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.)
The father's whereabouts have been unknown and he never had any relationship with the child. No person or agency has prevented the respondent father or mother from maintaining a child-parent relationship with Shannon, nor did economic circumstances prevent it. DCYS, acting through Ms. Sansone, the social worker assigned to this case, diligently worked with this mother for over two years by providing weekly visitations, a parent aide and supportive services. She refused, and by her own acts of omission and commission, by her acts of neglect towards herself and the child, the deterioration of a meaningful relationship with Shannon was her own doing. CT Page 2218
After considering all of the facts, the evidence is clear and convincing that termination of the respondents' parental rights is in the best interests of this child. Shannon is entitled to and deserves the security and permanency available to her through adoption by the petitioners.
Therefore, it is ordered that the parental rights of Teresa and Thomas G., the biological parents of Shannon G., be and are hereby terminated. It is further ordered that the Commissioner of DCYS be appointed statutory parent pursuant to section 17-112(i) of the Connecticut General Statutes for the purpose of placing the child in adoption as soon as possible. DCYS is ordered to submit a report, in writing, with this court within ninety (90) days of the date of this judgment and, thereafter, at least once a year until such adoption is finalized.
PETRONI, JUDGE