[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
NATURE OF PROCEEDINGS
By petition filed January 31, 1991 and amended on the first day of trial, October 22, 1991, the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Zoretha F. and Robert K., Sr. mother and putative father of Robert K., Jr. who was born on May 20, 1989 and has been residing in foster care since he was three days old. The petitioner alleges all of the nonconsensual grounds for terminating the rights of parents of children previously committed to DCYS as neglected or uncared-for pursuant to 46b-129
of the Conn. Gen. Statutes (Rev. 1991), as set forth in 17a-112(b) applicable to such committed children.
At the initial hearing on February 28, 1991 abode service was found to be insufficient under 45a-716, 717, incorporated by reference into 17a-112 subsection (b). Service by publication was ordered for April 23, 1991, at which time a brief default trial was to be conducted upon the continued failure of either parent to appear. On that date, however, although notice by publication was confirmed and neither parent appeared, the default trial could not take place due to the unavailability of the DCYS social worker. At the adjourned hearing a month later, Zoretha appeared and entered a plea contesting the allegations of the petition. An attorney was appointed for her and psychological evaluations ordered. Four months later, the evaluations completed, the court was informed that Robert K. Sr. had made his whereabouts known and was expressing an interest in the son whom he had not seen for more than a year. The same attorney who had represented him in the neglect proceeding concerning this child two years earlier was reappointed, but the father failed to appear at either of the two scheduled trial dates in October.
After the petitioner rested on October 23, 1991, the respondent mother electing to present no evidence in support of her position and the father having remained a nonparticipant in the proceedings, all parties rested and were given until November 7, 1991 for the filing of trial memoranda. The period of reserved decision is thus deemed to have commenced on the latter date.
Facts
Evidence offered at two successive trial dates, CT Page 1442 interpreted in the light of the prior record in this court involving this child and his parents, of which judicial notice is taken, supports the following findings of fact:
Zoretha F., herself a ward of DCYS, had just turned 15 when she gave birth to a daughter, the first of two children born to her and Robert K., Sr. an unemployed man in his early twenties with a history of mental illness and substance abuse. This child was placed in foster care immediately after birth but at two months was reunited with Zoretha at the Lourdes Family Center, a residential program for young mothers and their babies. Two months later Zoretha was discharged from that program for lack of cooperation and the daughter returned to foster care where she remained until of August 1989 — three months after the birth of Robert, Jr. — when her parents consented to the termination of their parental rights so that she could be placed in adoption. At the same time they admitted they could not then care for Robert Jr. and to with his commitment to DCYS for an initial period of 18 months.
Like his sister, Robert K., Jr. was placed in foster care immediately after birth. During her pregnancy his mother had lived with a variety of relatives, had run away from shelter programs provided by DCYS, had been rejected by Lourdes because of her lack of cooperation the year before, and therefore had no stable housing or alternative plan for the care of her son. Robert K., Sr. similarly, had no plan for the care of his namesake and joined with Zoretha, while represented by separate counsel, in agreeing on August 2, 1989 that Robert K., Jr. was uncared for under both statutory definitions found in 46b-120: Homeless, since neither parent could provide a home for him, and having specialized medical needs that neither parent could then meet.
In its first treatment plan following Robert Jr.'s commitment (November, 1989) DCYS announced its plan to seek termination of parental rights within the next six months — by May of 1990 — since neither parent had made progress toward a possible assumption of the child's care, continuing their patterns of mobility, living with relatives or in various shelters. (States Exhibit C., pp. 3-5) No such petition was filed in May of 1990, however, despite the fact that Robert Jr. had by then been in foster care a full year. Instead, in a treatment plan dated May 21, 1990, the announced permanency plan was to file a termination petition by July of 1990. July 1990 came and went but no permanency plan was instituted. In the treatment plan dated November 20, 1990, the petitioner for the third time announced its intent to file a termination petition within the next three to six months, no reason for the delay being given. CT Page 1443
Two months later the instant petition was filed, and the following month the original commitment was extended for 18 months effective February 2, 1991. Although both parents had received abode service for the hearing of February 28, 1991 neither appeared in court.
During the nearly two and one-half years that elapsed between Robert Jr.'s placement in foster care and the adjudicatory date of October 22, 1991, neither parent displayed any improvement in either capacity or motivation to assume his custody: Zoretha visited her son ten times in 1989, but only twice in 1990, the last visit taking place May 1, 1990, nearly eighteen months preceding the date of trial. Robert Sr. visited ten times in 1989 and 1990 combined, his last visit also taking place on May 1, 1990. Despite the child's visible distress at the last visit, DCYS scheduled another visit for June 4, 1990. The child was brought for the visit to the DCYS office but neither parent appeared or called to cancel. Zoretha next called for a visit on April 15, 1991 after more than 10 months absence from her son's life. Despite this long silence and the pendency of this termination petition, she was told a visit would be arranged at the next court hearing scheduled for the following week. Again Zoretha failed to appear and no further requests were made for another visit. Robert Sr. did not request any visit after May 1, 1990.
The clinical psychologist who had seen both parents in early 1989 saw them again in August of 1991. She repeated the recommendation she had made two years earlier for terminating the rights of both parents due to their multiple problems, finding no improvement in their circumstances in the ensuing two years to warrant a further delay in assuring permanency for this child. Dr. Augenbraun found Zoretha to be not only mildly retarded, but also oppositional, immature and socially inept, even for her level of retardation. (Testimony of October 22, 1991.) The evaluator concluded that the mother ". . . could not be rehabilitated within a reasonable period of time" sufficiently to assume parenting responsibility for Robert Jr. While the evaluator found the father to be functioning at a slightly higher intellectual level — borderline — his ability to parent any child was hampered by his history of mental illness, which appeared to be in remission but for which he was receiving no treatment, and of substance abuse. She found that the father could function adequately in settings where he himself was being cares for, but that his "significant psychopathology", the basis for his Aid to the Disabled income, precluded his assuming the care of a child. Neither parent offered any explanation for their failure to visit for the 15 months that preceded this evaluation. CT Page 1444
The DCYS social worker who had been Zoretha's social worker (before DCYS permitted her commitment to lapse in October of 1989 without benefit of a revocation proceedings, as mandated by46b-129, subsection (d)), testified that she had secured four different placements for the mother in the six months after Robert Jr. was placed in foster care, but Zoretha had run away or was discharged from each. The social worker learned after the fact that Robert Sr. had been out of state from June to November of 1990, but upon his return he did not request a visit. She confirmed that the father had actual knowledge of the termination proceeding, and she had spoken to him shortly before the hearing of September 12, 1991 but again he failed to appear.
Throughout this two and one-half year period, neither parent had ever had housing in their own names, both continuing to live with friends or relatives with frequent changes of address. Neither engaged in any form of treatment or counselling, either for their psychological problems or, in the case of the father, for substance abuse. At the time of the final hearing, Zoretha was again pregnant, her fifth pregnancy in three years, two having terminated prematurely. Even the visits that did take place in 1989 and early 1990, while at first harmonious, by the spring of 1990 had begun to be disruptive because of arguments — once involving blows — between the parents, with the child evidencing increased distress. (Testimony of Social worker Gaspsrik, October 22, 1991).
No testimony was offered by the respondent mother, and the father, although represented, failed to appear at both trial days.
Adjudication — As of October 22, 1991, Date Petition was last Amended.
The evidence offered by the petitioner supports by clear and convincing proof three of the grounds pleaded for terminating the parental rights of both parents:
1. No explanation was offered for the complete cessation of visits, or of requests for visits, after May 1, 1990. While Zoretha may have suffered some temporary health problems with her intervening pregnancies, no explanation was forthcoming for her failure to call and request visits when these problems had been addressed. No explanation was offered for her failure to appear in court in April of 1991 to arrange the visit she had called to request on April 15, 1991. Robert K., Sr. may have lived out of state for five of the thirty months, but no explanation was offered for his failure to request a visit upon his return to Connecticut eleven months before the adjudicatory date in October CT Page 1445 of 1991.
The abandonment by both parents dates back to the last visit with their child, nearly eighteen months prior to the adjudicatory date for this proceeding, and is not only clear and convincing but overwhelming proof of abandonment in the statutory sense of the failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." See In Re: Rayna M., 13 Conn. App. 23 (1987).
2. Neither parent was closer to being able to act as Robert Jr.'s primary caretaker in October of 1991 than when he was committed to DCYS in August of 1989. Neither had secured stable housing: neither had maintained any manifestation of an interest in or knowledge of their son. Neither had demonstrated the ability to take care of themselves without the help of relatives or friends, much less the ability or desire to assume care of a child. This record provides clear and convincing proof that these parents ". . . of a child who has been found by the Superior Court to have been neglected or uncared for in prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child" within the meaning of the statute. Robert Jr. has lived with the same foster parents since birth. He has waited his entire two and one-half year lifetime for a permanent home. His greatest need — permanency with competent caretakers — cannot wait longer to be fulfilled. In Re Davon M., 16 Conn. App. 693
(1988).
3. Dr. Augenbraun testified that a child the age of Robert Jr. could have no present memories or positive feelings for parents last seen nearly eighteen months ago, particularly since their last encounter was so disturbing to him. And considering their lack of rehabilitation, the diminution of their manifested interest in him, Zoretha's latest pregnancy and Robert Sr.'s failure even to appear at the termination trial, it is established by clear and convincing proof that not only is there no on-going parent-child relationship between the child and either parent, but also "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
The fourth ground pleaded for terminating the rights of both parents — the denial, by reason of acts of parental commission or omission, of the care, guidance or control necessary for his well-being — must be dismissed for failure of the petitioner to establish that the child has been denied any necessary care since being placed in foster care shortly after CT Page 1446 birth. The fact that the care bestowed on him has not been provided by either parent does not provide proof of this ground: Since his placement in foster care and the issuance of temporary custody to DCYS, neither parent has owed Robert Jr. any duty of care. This ground is, therefore, dismissed.
Disposition — As of October 23, 1991, the Final Day of Hearing.
Having found three grounds to terminate the parental rights of both parents, the court must, after considering the six factors set forth in subsection (d) of 17a-112, determine if such judicial action will serve the child's best interests.
1. Because Zoretha was a state ward when Robert Jr. was born, DCYS offered her a multiplicity of services. Most important was to find Zoretha a place to live for herself, but she frustrated many attempts by walking away from or being asked to leave a variety of different living situations. Without stability of her own living circumstances, DCYS could not provide counselling or any other kind of services, other than to facilitate visits. DCYS provided visits whenever requested by either parent. Robert Sr., was reported to have secured relative stability for himself with a woman and her three children, but he never offered this as a living situation for Robert Jr., nor did the woman come forward and offer her home for the child. Without a home, and without any manifested desire to visit with his child, referring Robert Sr., for drug abuse or mental health counselling would have been a futile gesture.
2. No court orders were entered into or agreed upon by the parent. The commitment of the child in August of 1989 left the parents with residual parental rights to visit and to seek the return of their childs' custody. After May 1, 1990, neither parent asked to visit until months after this petition was initially filed in January 1991. Zoretha requested just one visit in April of 1991, but failed to appear at the court hearing the following week when arrangements were to have been made for this visit, and she never repeated this request. Robert Sr. has made no request for nearly 18 months. DCYS never refused a requested visit with either parent.
3. Robert Jr. can have no feelings for or emotional ties with either parent considering that he last saw them when he was less than a year old, and is now two and one-half. He has become well bonded with the foster parents who have had him since birth and who are willing to adopt him as a permanent member of their family if his parents' rights are terminated.
4. Robert Jr. at two and one-half is at a critical stage of the development of any child. His principal needs at this age is the CT Page 1447 assurance of permanency with competent caretakers, preferably with those who have raised him from birth.
5. Neither parent has made any visible effort to adjust their circumstances conduct or conditions to make it in the best interest of Robert Jr. to "return him to his home in the foreseeable future" — even hypothesizing that either parent had a home to which the child could be invited to live. Neither has secured stable living arrangements over which they have control; both abandoned efforts to visit the child 18 months before the final trial date; both were out of touch with DCYS for months at a time during the two and one-half years the child was in foster care.
6. Nothing prevented either parent from maintaining a meaningful relationship with the child except their inherent problems of retardation and personality traits unconducive to the nurture of children. The requirement of DCYS that scheduled visits be confirmed by the parent before taking place is not unreasonable considering that on several occasions the child was brought for a visit and the parents filed to appear. Economic circumstances have not been suggested by either parent as a reason for their failure to stabilize their own lives or to maintain a reasonable degree of contact with their son.
Having considered the foregoing, it is found by clear and convincing proof to be in the child's best interests for his parents' rights to be terminated so that he may know the security of permanent placement in adoption after spending his lifetime, thus far, as a foster child. Therefore it is ORDERED that the parental rights of Zoretha F. and Robert K., Sr. in and to their son Robert K., Jr. be and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child forth with in adoption, and to secure that end, such Commissioner is further ORDERED to submit in writing a report as to the progress toward such adoption no later than 90 days following the date of this judgement, and thereafter at such intervals and in such form as this court may from time to time require. If the child is not placed in final adoption on or before June 1, 1993, the said Commissioner is ORDERED to submit a Motion To Review Plan for Terminated Child by such date to be in conformity with federal law.
Appeal
Zoretha F. and Robert Sr. have 20 days from the date of this judgment in which to take an appeal. If they request an appeal and their trial counsel are willing to represent them, this court will appoint those attorneys to act as appellate counsel at CT Page 1448 public expense until all appellate process is completed. Practice Book #4017. If, however, in the exercise of professional judgment as officers of the Superior Court, the attorneys decline to perfect such appeal because, in their opinion, it lacks merit, they are not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice book #4040. Such motions, if unopposed, will be granted ex parte and new attorneys appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The parties will then be informed by the court clerk that they have the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963): Fredericks v. Reincke, 152 Conn. 501 (1965).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interests are entitled to at least as great a degree of consideration as those of the parent whose right to raise the child is at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process is exhausted.
Entered at Hartford this 21st day of February 1992.
Frederica S. Brenneman, JUDGE.