[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
On July 30, 1991, fourteen months after her commitment to the Department of Children and Youth Services (DCYS) as a neglected and uncared-for child. Nina D., born May 18, 1989, became the subject of this petition by which DCYS seeks to terminate the rights of Patty D. and Benedicto R., her mother and putative father, so that, after spending more than 19 of her 26 months of life in foster care, she might know the security of a permanent home. The father, who has never acknowledged paternity or been adjudicated to be the father, was duly served by publication pursuant to (c) of 45a-717 of the Conn. Gen. CT Page 2523 Statutes. (Rev. 1991), his whereabouts having at all times been unknown to the petitioner.
The mother, who had been personally served, appeared at the initial hearing of August 29, 1991 represented by [the same attorney who had represented her] Court-appointed counsel as she had been at all prior proceedings concerning this child. The allegations of the petition were contested and, on motion of the petitioner, the court ordered an update of a psychological evaluation of mother and child by Dr. Augenbraun, the psychologist who had seen them in connection with the earlier neglect petition in January of 1990. The parties subsequently agreed that testimony regarding the mother's health, which had been offered on December 5, 1991 in connection with a neglect petition concerning Nina's younger sibling, would be transcribed and regarded as a part of the proceedings in the instant action.
Evidence was offered in three trial dates concluding February 10, 1992. All parties waived the opportunity to file trial memoranda so that the date on which decision is deemed to have been reserved is February 10, 1992. Since the pleadings had never been amended, the adjudicatory date must be considered the date these petitions were filed, while the dispositional date is the final trial day.
Facts
Evidence offered at trial, interpreted in the light of the prior record in this court concerning Nina D. and her mother, of which judicial notice is taken, supports the following findings of fact:
The adolescence of Patty D. was clouded by living with an abusive father, taking refuge in shelters with her mother, seeing her sisters placed in foster care and suffering the untimely death of her mother. After living for two years with a grandmother in Italy, Patty returned to Connecticut in 1987, obtained her high school equivalency, and entered into a brief relationship with Benedicto R. who became incarcerated before Nina was born and has, according to the mother, seen her but once since birth.
DCYS began receiving referrals soon after Nina was born because of her mother's history of epilepsy with grand mal seizures, uncertain housing plans, and notably confrontational style with hospital staff during the time of delivery. Before Nina was four months old, DCYS had received and confirmed reports that Patty had appeared to be ill and unresponsive to the infant on a number of occasions and that she had physically disciplined the baby inappropriately. Even after Patty and Nina CT Page 2524 were referred in mid-September, 1989, to a program of Intensive Family Preservation, DCYS continued to receive referrals concerning Patty's ability to provide adequate care for the baby, [despite these concentrated supportive services: She repeatedly ran out of formula and diapers, necessitating delivery of emergency supplies;] Her electricity was turned off; she was evicted and the child exposed to the elements in inadequate clothing. She and Nina moved from one shelter to another and finally moved in with friends who, she reported, took her food stamps for partial payment of rent (October-November 1989). After further reports that Patty, because of continued noncompliance with her epilepsy treatment, was again having grand mal seizures that rendered her temporarily incapable of caring for a baby, DCYS filed a neglect petition and secured Nina's temporary custody on November 27, 1989. At that time, with Patty's mother dead, her father alienated and her three younger siblings unavailable for child care, Nina was placed in a DCYS foster home where, except for less than six weeks in 1991, she has remained ever since, and Patty moved to temporary quarters in the St. George Hotel where she remained for nearly a year thereafter.
In the initial hearing on the neglect petition filed on Nina, Patty appeared with counsel, and temporary custody was continued pending the securing of a psychological evaluation. This evaluation recommended continued foster care and set forth conditions for the mother before the child's return: Psychotherapy; parenting classes; appropriate housing with supportive supervision; vocational training and education. Since Patty, on February 26, 1990 indicated in court her continuing opposition to the DCYS recommendation for commitment, the matter was continued to March 13, 1990 but on that date the mother failed to appear. A further continuance was therefore ordered to April 3, 1990. Again only her attorney appeared and since no explanation was offered for her absence, the court proceeded by default to adjudicate Nina to have been neglected and uncared-for (homeless) as set forth in the original pleadings filed four months earlier, and committed the child to DCYS for an initial period of 18 months. By agreement, the court specifically provided that as soon as the mother secured adequate housing she could petition for revocation of commitment without waiting the six months required by subsection (g) of46b-129.
By the fall of 1990, Patty had located appropriate housing but did not file a petition to revoke Nina's commitment, presumably because of the impending birth of her second child. DCYS was able to furnish Patty's new home before Katherine D. was born November 20, 1990, the product of Patty's relationship with an older man reported by the mother to be married, have CT Page 2525 older children, and to abuse alcohol. Katherine was born with cerebral palsy, but Patty's ability to utilize offered services at that time rendered her home situation adequate for the newborn. The DCYS treatment plan for Nina, submitted in December of 1990, was for return to the mother, if she continued to do this well, by June of 1991 since she had been visiting Nina regularly, her home was deemed adequate for two children, and she was then cooperating with the Family Preservation Program as well as with a home health aide who visited her half of every weekday. (State's Exhibit G., Treatment Plan for December 27, 1990.) DCYS was then arranging a referral to Family Services Woodfield to take over when the Family Preservation Program ended, as well as for a parent aide and a Title 20 counsellor. Visits with Nina, which had been bi-weekly, became weekly in early 1991 and four days after Nina's second birthday, she was removed from her foster home of 18 months to be returned to her mother and six-month old baby sister. She appeared at the time to show no ill effects from this transition.
Shortly after Nina's return to her mother, however, the situation deteriorated rapidly. Patty became resistant to the various helping professionals, claiming she did not need their help; her apartment became dirty and disorganized; both children developed head lice; her continued noncompliance with her own medical needs resulted in two witnessed episodes of grand mal seizures in June 1991. (Testimony of Social Worker Powell, February 5, 1992). Fortuitously, helping professionals were present on both occasions to ensure the children's safety during the 15 to 25 minutes that the mother was "out of it" following each seizure. (Testimony of King and Augin, February 5, 1992.) DCYS also learned that earlier that month, when Nina, left unsupervised and unconfined to her room, had turned on the gas stove, Patty had disciplined her physically, leaving a visible bruise and bringing a downstairs neighbor up in response to Nina's screams. Patty later acknowledged to the social worker than she had hit her two-year old "good and hard" (State's Exhibit B., p. 12) to teach her a lesson, and seemed pleased with the fact that now Nina feared to approach the stove or even enter the kitchen. When the DCYS social worker suggested that hitting Nina "good and hard" was an improper method of disciplining a child of two, Patty contradicted her, accused her of knowing nothing about child care, and warned, "You'd better leave — fast — if you know what's good for you." (Testimony of Powell, February 10, 1992). The day after this conversation, all service providers for this family met at St. Vincent Hospital. It was a consensus of the ten gathered professionals that Nina had to be removed at once: Patty's cooperation had diminished with the child's return, leaving Nina at risk with no foreseeable benefit from introducing any further CT Page 2526 services in view of Patty's clear statement that she had "had enough", that so many people interfering in her life caused her stress. Her further statements that these people didn't know anything anyway and were not needed since she had no problems and therefore was no longer willing to work with DCYS, home health aides or visiting nurses, led to the conclusion that she was not "workable" with regard to Nina. (Id.) The liability noted by Dr. Giannetti had been experienced by the DCYS social worker: Patty's moods were observed to swing from being pleasant, caring, kind, calling the social worker "Aunty Phyllis" to being, at other times, hostile, aggressive, saying personal comments to the social worker's detriment, including telling the psychiatrist that the social worker was bribing her to stop opposing the termination petition (State's Exhibit C. p. 2).
Dr. Hoffman, director of the walk-in clinic of Outreach Services at St. Vincent's Hospital, testified that she had instructed Patty repeatedly over the three years preceding the court hearing (December 5, 1991) on the importance of compliance with medication and of keeping regular dates where blood level tests could determine if the dosage was being taken, and, if so, was sufficient. Over the course of the three years, both before and after Nina had been removed from her care in large part because of her uncontrolled seizure activity, Patty's compliance with scheduled appointments never exceeded 50 percent. (Transcript, December 5, 1991, p. 23.):
. . . with that erratic attendance, it is difficult to control a seizure disorder. . . we frequently reviewed with her how the clinic operated and tried to come up with a system that would work for Patty and took a lot of compromise. . . We attempted to review with her the need to better define her seizure disorder, the fact that we needed to monitor drug levels, particularly during any other change in her condition. . . What I explained to her was my concern was that if the seizure disorder was not controlled, there would be times when she would be unconscious and therefore not able to supervise the children. Id.)
The doctor was uncertain if Patty understood these instructions because of her emotional reaction to suggestions and her continuing failure to comply with appointments. (Id. p. 46.) When these emotional responses continued, despite the clinic's attempt to "modify our procedures to find other ways to accommodate her needs" (Id., p. 47), counselling was suggested but the mother was resistant and never followed through. Dr. Hoffman's records showed the same degree of noncompliance with appointments (50-50) and the same reported incidence of seizures (approximately ten a year) both before and after Nina was returned to her care in May of 1991. CT Page 2527
Dr. Hedy Augenbraun, noting that although most of her suggestions of January of 1990 had been implemented, they had not rendered Patty capable of sustained child care responsibility. She now recommended termination of her parental rights in Nina:
When she is not under a severe threat, Ms. D. is capable of functioning minimally. However, it is highly possible that under stress, Ms. D.'s precarious balance falters, that she becomes overwhelmed and that she could lash out in anger toward her children. She is highly dependent on others and poorly organized . . . Given Ms. D.'s severe personality disorder . . . and the likelihood that her relationship with the older child is precarious due to inadequate bonding, inconsistent parenting, and overly harsh discipline, it is recommended that parental rights be terminated. Ms. D's unpredictable and inconsistent behavior, in the context of her personality structure, and her inability to modify her behaviors despite significant help over the past year, indicates that the children would be at significant risk if they remained in her care. (State's Exhibit D., p 7).
In her testimony on February 26, 1992, Dr. Augenbraun explained that this recommendation was based upon comparing her findings in October 4, 1991 with those made on January 12, 1990. She found that despite the implementation of her recommendations in the earlier study (State's Exhibit F), there had been no significant improvement in Patty's ability to care for this child. The psychologist found the mother to be often on the verge of losing control, particularly when under stress, and that the stress of child care would likely lead to such loss of control. She remains so dependent on others that when she lacks externally imposed structure and support, she has only a limited ability to care for children, and has demonstrated recently that she may reject offers of such support. Being intensely self-focused and histrionic, when very stressed her defenses (e.g. her obsessive-compulsive behavior) break down and the underlying violence comes out. Like the psychiatrist, who evaluated Patty in August of 1991, the psychologist found her to have the poor impulse control and judgment associated with a borderline personality. Dr. Augenbraun recommended termination of parental rights since there had been no lasting positive change resulting from the provision of a variety of helping services over the course of two years, and the child was increasingly showing signs of distress from being "very much caught in the middle". (Testimony of February 6, 1992.) Patty had become "enraged" when Nina referred to the foster mother as "Mommy" resulting in the child's confusion: "She doesn't know who her Mommy is." Patty's personality disorder makes it hard CT Page 2528 for her to put a child's needs ahead of her own, and, following Nina's replacement in foster care on July 2, 1991, the child has become increasingly distressed at the continuing contacts with her biological mother. Stuttering, begun in connection with visits, now persists in her conversation with most adults. Dr. Augenbraun found it "most probable" that the child's increasing anxiety and stuttering has been caused by parental visits. While there might be some temporary loss if visits with her mother were stopped, in the long run it would be less detrimental to halt the current triangulation of her allegiance and even in the short run Nina would be relieved of the anxiety caused by these visits.
The most striking aspect of the psychiatric evaluation conducted by Dr. Giannetti on February 6, 1992, was Patty's "labile" affect. (State's Exhibit C. p. 2) In his testimony he explained this as abruptness in mood changes which he regarded as one of four indications of an organic personality disorder, the others being impulsivity, characterized by interpersonal problems, poor judgment and sexual indiscretions; a chronic disinterest in things in general; and suspicious or paranoid ideation. He found her prognosis to be guarded due to the probability of organic causes for these characteristics not amenable to treatment. He concluded, after this evaluation on August 27, 1991 that:
. . . given her questionable judgment, lability of manner and affect, and the history as given by her, . . . one could envision her having significant difficulty dealing with the care of young children. Thus, while she was not considered an imminent danger to herself or others, she might, even inadvertently, become so if irritated, with or without more overt "seizure phenoma." [Sic] (Id.)
After viewing records which confirmed his clinical interview with her, he concluded that Patty's incapacity to care for Nina for the past two years was unlikely to change, that any treatment to be effective would be long term and he saw no signs that she was motivated ever to enter such treatment. He did not ascribe all of the personality traits that impeded competent child care to her seizure disorder; even if that were to be brought under control, the personality disorder would take major effort, time and possibly additional medication. Since Patty had already demonstrated problems complying with treatment for her seizure disorder, he concluded that it is "unlikely" she would be sufficiently "invested" to engage in psychological treatment to any beneficial effect. (Testimony of February 2, 1992).
Testifying on her own behalf, Patty described the CT Page 2529 first months of Nina's life as one of great mobility; she lived in seven different places in five months, in one of which she was compelled to pay a "friend" part of her food stamps as partial rent. She ascribed Nina's removal at the age of six months to testimony offered by that "friend" and not to any dereliction of responsible parenting on her part. She denied having had two seizures in June of 1991 or inappropriately disciplining Nina at the same time, claiming that she had seen no bruises on Nina's face. She denied having heard Nina call the foster mother "Mommy", although she acknowledged that she would prefer that Nina not do so. She denied missing half of her appointments at the seizure clinic or being remiss in taking her medication: "Of course I was taking my medication properly. You think I want to hang myself?" She denied that Dr. Hoffman had ever warned her of the consequences of being noncompliant with her seizure medication. She admitted being depressed but was uncertain whether she needed counselling and while stating that she would be willing "to start tomorrow", was unable to explain her failure to enter counselling when repeatedly recommended earlier.
Adjudication — On Facts as of date petition was filed (July 30, 1991) —
Father — Benedicto R., having never acknowledged paternity, been adjudicated to be Nina's father, appeared on her birth certificate or lived with or contributed to her care, is not legally entitled by either statute or Practice Book Rule to be regarded as a "parent" or other legal party at interest. Indeed, such a putative father is not even entitled to notice under subsection (b) of 45a-717, subsection (e) incorporated by reference into the statute applicable herein subsection (e) of17a-112.) He is at most, a nominally putative father, entitled to be invited into court for the threshold purpose of acknowledging paternity. This has been accomplished by legal notice by publication. This person, according to the only testimony in this record, has only seen Nina once since her birth and has done nothing to contribute to her support or to establish his legal responsibility as her parent. This circumstance supports, by clear and convincing evidence, three of the four statutory grounds pleaded for terminating whatever parental rights this named putative father might have: He has abandoned her, not only with the statutory definition but also by the more stringent standards of the common law. At the time of her commitment to DCYS in April of 1990, his whereabouts were unknown to Nina and to her caretakers. Fifteen months later his whereabouts remain unknown, and in the interim he made no effort to contact the child or her legal guardian. This constitutes a failure to achieve such degree of personal rehabilitation as would encourage the belief that he would ever, must less within CT Page 2530 a reasonable time considering her age and needs, be able to assume a responsible position in her life. And these same circumstances compel the conclusion that there could be between him and Nina no relationship of any kind, much less a parent-child relationship as defined by law, and to permit any longer than Nina's more than two-year lifetime to pass in the hope of establishing such relationship would clearly be inconsistent with the child's best interests. Since Benedicto, not having been established as the child's father by acknowledgment or adjudication, owed the child no legal duty of care, it cannot be found that she had ever been denied necessary care by any of his acts of commission or omission. Only parental acts of commission or omission constitute this ground for terminating a parent's rights. This ground, is therefore, dismissed.
Mother — The petitioner has established, by clear and convincing proof, both of the pleaded grounds for terminating her parental rights:
1. Failure to rehabilitate — On the adjudicatory date of the instant petition Patty was no closer to being able to provide Nina with responsible care than she was in November of 1989 when the child was first placed in foster care, or in April of 1990 when she was committed to DCYS as neglected and uncared-for. While there was a period during the fifteen months following commitment when Patty was complying with the requirements for reunification — she secured housing, was in apparent compliance with her own medical needs was cooperating with supportive community services — within a few weeks of Nina's return to her care on a trial basis, most of these gains had vanished. Her noncompliance with her medical needs resulted in two documented episodes of grand mal seizure rendering her incapable of responsive parenting; she had reverted to inappropriate physical discipline despite parenting assistance from a number of sources; her increasing hostility to helping professionals caused her to reject suggestions for improvement. Neither the psychologist who had seen her before Nina was committed as well as in connection with this action, nor the psychiatrist who evaluated her shortly after this petition was filed, predicted any improvement in her ability to parent Nina in the foreseeable future, and both recommended termination of parental rights to ensure the child's future well being. This constitutes clear and convincing proof that the mother of this child, who was found in a prior proceeding to have been both neglected and uncared for, has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Nina's age and needs, that she could assume a responsible position in the life of that child. In Re: Reyna M. 13 Conn. App. 23, 31-32 (1987). CT Page 2531
2. Acts of commission or omission: In the less than six weeks that Nina spent on a trial placement back with her mother (May 22, 1991 — July 2, 1991), there were three incidents in which she was denied, by acts of parental omission or commission, the care, guidance and control necessary for her physical and emotional well-being. On two occasions her mother, whose compliance with prescribed treatment for epilepsy never exceeded 50 per cent despite repeated warnings of the impact of noncompliance on the young children in her care, suffered grand mal seizures when caretaking two-year old Nina and her six-month old sister. Only the fortuitous physical presence of helping professionals on both occasions ensured the children's safety. On a third occasion, Patty's harsh method of disciplining Nina — beating her to the point where observable bruises resulted and a downstairs neighbor came up to intervene — occurred after months of intervention by various supportive services focused on improving her parenting capacity.
Disposition — On facts as of February 10, 1992, the last day of trial.
In the six months between the adjudicatory and dispositional dates, no major changes occurred in Patty's situation. She maintained her housing, continued her 50 percent compliance with her own medical needs, visited Nina when permitted. Nina, on the other hand, increasingly evidenced distress with these visits. Upset at her mother's rage when she had referred to the foster mother as "Mommy", she began to stutter, cried on several occasions and more recently told the social worker she did not want to come on the visits. According to the social worker, her sadness becomes more marked with each visit and on the most recent — one week before the final day of trial — she never smiled throughout the visit. Meanwhile, Nina's attachment to the foster family, interrupted for the brief trial placement with Patty, has grown very strong. She is eager to return to them after visiting her mother, her face lighting up and exclaiming "Mommy" and "Daddy". Her stuttering, originally noted just on the days immediately before and after visits with her mother, has become progressively worse. She now stutters in conversations with all adults who ask her questions to which she strains to respond with the "right answers". (Testimony of Powell, February 10, 1992).
All services in place for Patty had stopped with the children's removal. Five months later, in December of 1991, Patty entered a parenting group sponsored by Save The Children, and no more seizures have been reported. Her attitude has again become friendlier and she appears to be making more efforts to listen and learn. While the plan of DCYS for the younger child CT Page 2532 is eventually to reunite her with the mother, Nina, now nearly three, needs permanency without further delay.
Before the court may terminate a parent's rights, it must duly consider the six factors set forth in subsection (d) of 17a-112:
(1) No services can be offered to a parent whose whereabouts, as were Benedicto's are at all times unknown. The state, through DCYS, and a variety of community agencies, offered a wide variety of supportive services to Patty repeatedly, both before Nina's removal from her mother's care at the age of six months and for eighteen months after that removal. When Patty was receptive, such services enhanced her ability to provide for Nina to the point that Nina was returned to her care at the age of two. Patty's liability, her alternating mood changes so noted by the clinicians who evaluated her, caused her cooperation to stop until, at the time this petition was filed and during the five months thereafter, she was overtly hostile, even complaining that the number and variety of such services caused her stress and that she had "had enough".
(2) No court orders or agreements could be entered into with an absent father. The only orders imposed by this court on Patty were for court appearances and cooperation with clinical evaluations with which she complied. Service agreements were entered into between Patty and DCYS and her momentary compliance resulted in Nina's return to her care in the spring of 1991. Unfortunately, that compliance eroded soon thereafter.
(3) Nina can have no feelings or ties with a father she has seen only once since birth. She certainly knows who her mother is but, following her second removal from her care, her distress at the time of visits has resulted in increasing anxiety and stuttering, during the seven months she has been back in foster care. Her mother's anger at her addressing the foster mother — with whom she has spent more than 25 of her total life of 33 months as of the dispositional date — as "Mommy" and Nina's increasing confusion as to whom she can regard as her principal source of secure nurture has exacerbated the emotional toll that being a foster child is taking from her.
(4) Nina, as of the dispositional date, was nearly three, having spent less than eight months of her life in her mother's care and having seen her putative father but once in her life. She is now at an age to move beyond the confines of the home into the wider world of nursery school and, not long from now, public school. She should not be required to wait still longer for the permanency the psychologist found crucial to her future emotional health. CT Page 2533
(5) Benedicto has made no effort to adjust his circumstances, conduct or conditions to make it in Nina's best interests to place her in his care in any foreseeable future. Patty has made sporadic efforts over the course of nearly three years to bring her seizure disorder under control and to learn effective ways of raising children. Unfortunately, the combination of her 50 percent noncompliance with her own medical needs, resulting in grand mal seizures when caring for her children, and her underlying personality disorder which manifests itself, in part, in the exercise of poor judgment and mood swings that alienate helping professionals and her own child, combine to erode the beneficial effects of her past efforts. She certainly has maintained contact with Nina and DCYS at all times, but her net gain in child caring ability between the time that Nina was first removed in November of 1989 to the dispositional date more than two years later is minimal.
(6) Nothing prevented the absent Benedicto from maintaining a relationship with the child who is purportedly his daughter. The only thing that prevented Patty from maintaining a meaningful relationship with Nina was the child's removal from her care on two occasions. Each time such removal was the considered decision of DCYS on the advice of a number of different professionals concerned with Patty's physical and mental health. Such removal, on both occasions, cannot be deemed unreasonable.
Having considered the foregoing, and mindful of the fact that Patty retains parental rights in her younger daughter and is, at the moment, working hard to secure her return, it is found by clear and convincing evidence to be in the best interests of Nina to have her lifetime of caretaking uncertainty ended so that she may know the emotional security of a permanent home at last. Therefore it is ORDERED that the parental rights of Patty D. and Benedicto R. (insofar as he may have any) in and to the child Nina be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of securing the child's adoption as expeditiously as possible, and to this end such Commissioner is ORDERED submit within 90 days of this judgment a written report as to the progress toward such adoption, and thereafter to report at such intervals and in such forms as this court may from time to time require. If Nina's adoption is not finalized by July 1, 1993, said Commissioner is further ORDERED to submit a Motion to Review Plan for Terminated Child no later than such date in order to ensure a judicial review on the record within 18 months of the date of this judgment to be in conformity with Federal law. CT Page 2534
Appeal
Patty D. has 20 days from the date of this judgment in which to take an appeal. If she requests an appeal and her trial counsel is willing to represent her, this court will appoint that attorney to act as appellate counsel at public expense until all appellate process is completed. Practice Book #4017. If, however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, she is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book #4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party will then be informed by the court clerk that she has the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke,152 Conn. 501 (1965).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interests are entitled to at least as great a degree of consideration as those of the parent whose right to raise the child are at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process, which could take years, is exhausted.
Entered at Bridgeport this 18th day of March 1992.
FREDERICA S. BRENNEMAN, JUDGE