[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff wife, Katharine Cronin, commenced this CT Page 60 action for a dissolution of marriage on the ground of irretrievable breakdown by writ and complaint returnable March 3, 1992. In her complaint, she also seeks alimony, a fair and equitable property settlement, and other relief. The defendant husband, James T. Cronin, filed an answer admitting all of the allegations of the complaint excepting the allegation of irretrievable breakdown, and left the plaintiff to her proof. The parties were represented throughout the proceedings by counsel, submitted financial affidavits, introduced numerous documentary materials into evidence, and filed written claims for relief and proposed orders. Each testified, and the wife called three other witnesses.
From the evidence, the court finds the facts as follows.
The wife, whose maiden name was Katharine O'Keefe, married the husband on October 8, 1983 in East Haddam, Connecticut. She has resided continuously in this state for at least one year before the filing of the complaint. All statutory stays have expired and this court has jurisdiction. The parties have no minor children issue of their marriage and none were born to the wife since the date of the marriage. Neither party is the recipient of public assistance.
This is the second marriage for each. The husband is 51, the wife 41. Both are in good health and are high school graduates. The wife has some college courses and took a dog grooming course out of state, which has certified her as a dog groomer. The husband has taken criminal justice courses.
At the time of the marriage, the wife had custody of her two young minor children, a son and a daughter, who resided with her in a home she derived from her first marriage. The defendant moved in to this family setting about one year before the marriage. The plaintiff's relationship with her children became difficult and troubled, and the daughter moved out in about 1989 to live with her father, the son followed about one year later. The plaintiff assigns the fault for the breakdown of the parties' marriage almost entirely to the defendant and testified that after the marriage, he was cold to her and the children, insulted them and put them down. She further testified that he was dominating and domineering, made the children feel intimidated and fearful, and that his actions alienated the children and caused them to leave. She also CT Page 61 testified about the defendant's lack of personal hygiene during his off time from work (he worked a rotating schedule as a Connecticut state trooper of four days on, three days off, then three on, four off), and that he provided barely enough money for household expenses, and that she was deprived of money to buy clothes and for `extras' such as haircuts, movies and the like. She also claimed that he alienated her friends and wanted her all to himself. The parties attended counseling, first together, then separately, which did not improve the marital relationship.
The husband claims that he was unaware of any marital problems, that her problems and stress were associated with her troubled relationships with her children, and that he wanted to and would take her back, even as of the date of trial. It is worthy of note that since the spring of 1992, shortly after the commencement of this action, the parties continued to reside in the jointly-owned dwelling at 488 Trumbull Highway, Lebanon, in separate parts of the home, right up to the date of the trial, and there was no evidence that they participated in the normal relationships ordinarily incident to a marriage. It is clear that despite the husband's stated position that he is willing to "take his wife back", the marriage has broken down irretrievably.
While the court gives no credence to the wife's claim that the husband did not adequately provide support for her and her children and deprived her of extras, in the light of the substantial expenditures made by him for a spa, dogs, a fence, horses, the horse barn, a vehicle, and a horse ring, and her access to joint funds, etc., the court also recognizes that the wife's minor children and the requirements of caring for them and parenting them would strain and stress any marriage when a step parent enters it; however, the court does find the balance of the wife's testimony as to the causes of the marital breakdown more credible than the husband's; the court simply cannot credit his assertion, after a number of joint and separate counseling sessions, that he was unaware of any problems in the marriage, and this corroborates the wife's assertion that he put no effort into the relationship. The court concludes that a larger share of the responsibility for the breakdown of the marriage must rest on the defendant's shoulders.
The defendant worked for 23 years as a Connecticut CT Page 62 state trooper detective until his retirement in 1990. Almost immediately, he obtained a position as an investigator for Travelers Insurance Company, where he currently works. He now receives $867.34 gross income per week from that job and $572.88 from his pension for a total of $1,440.22 per week. Although his financial affidavit indicates a total net income of $881 per week, when his deferred compensation take out of $123.51 per week from his employment income, and an overstatement of his tax and insurance deduction of $50 per week are added back, his true net weekly income is about $1,050. The husband is apprehensive with respect to his job security as a result of recent layoffs imposed by his employer, but at this time, he has not received a layoff notice, nor has he been told that he will. Almost all of his earnings went into the marital home and were used for family purposes. Some went into investments.
The wife has worked as a clerk and bookkeeper during her first marriage and helped put her first husband through college. At the time of this marriage, she had worked for Glastonbury Bank and Trust Company as a bank teller for about one or two years, and continued for another year or so, when she left in 1984. She earned about $10,300 in 1982 and $11,000 in 1983. She also earned $3,000 from her bank job and about $2,600 as a waitress in 1984, and about $2,000 as a waitress in 1985, when she took a job as a rural mail courier. She earned about $3,250 in the courier job and left. Her Glastonbury Bank and Trust Company job involved a promotion to a different office, further from home, on a grueling schedule of 7 a.m. to 7 p.m., four days a week, with three days off, then three days a week on, four off. She left both the bank and post office jobs with the husband's advice and consent, as they were very difficult and wearing on her. Since then, after the completion of a dog grooming course, she has worked as a manager of a dog grooming salon for three months for $275 per week, and at two "busy season" jobs earning $10-$11 per hour which were each of short duration. Almost all of her earnings and her $100 per week child support payments which reduced to $50 per week when her daughter left in 1989, and to nothing when her son left in 1990, went into the family home and were used for family purposes. Until the marriage breakdown, the plaintiff was the primary homemaker, and did the cooking, cleaning, shopping and laundry, and also was primary caretaker of her children.
Indeed, the court concludes that until the commencement of this action, the husband discouraged his wife CT Page 63 from obtaining out of the home employment, in large part due to his fear of increased income tax liability and his ability to "make up" her lost income with his overtime work. However, since this action began, the wife has made little sustained use of her significant earning capacity and ability to work and testified that one of her prior attorneys advised her in the early fall of 1993 that it would not be "worth it" for her to seek and obtain employment since her court hearing was coming up. She has been doing "odd jobs" earning only $50 per week. The court does not and cannot condone the wife's unwillingness to seek and obtain gainful employment under these circumstances.
In addition to the monetary contributions each made to the marriage from their respective incomes, it is significant note that the husband purchased the lot upon which the jointly owned dwelling was built with $20,000 from funds he had before the marriage. He acted as the general contractor for the construction of the dwelling which was completed in early 1984. He also contributed $26,000 received from the divorce settlement from his first marriage and a $10,000 gift from his mother to the home and for family purposes, including an addition which was completed in 1991. The home was also financed with a construction mortgage of $60,000 which was later refinanced for the addition. The wife contributed to the home and for family purposes the sum of $8,500 which were the proceeds from the sale of her home (received in her divorce proceedings) and the $5,000 inheritance received from her grandmother.
The husband also received $12,900 lump sum vacation pay upon his retirement which went as deferred compensation into his Aetna plan. He also received shortly after, the sum of $8,481 gross in accrued sick pay; the net proceeds of about $7,300 were used for family purposes.
The husband also held other assets predating the marriage, including some IRA accounts totalling about $4,000 and some Connecticut Natural Gas Company (CNG) stock, also about $4,000. The CNG stock originally owned at the time of the marriage was sold, and the present CNG stock held in joint names accumulated by reason of dividend reinvestment and a stock split. The other stocks shown on the husband's financial affidavit as jointly owned were acquired during the marriage, all from his income. His Panorama IRA account, aside from the value of his premarital IRA account balance, his Fidelity IRA, his Travelers 401K and Aetna stock plans increased in value due CT Page 64 to his contributions during the marriage from his earnings and reinvestment of dividends and interest earned by the various plans. It should be noted that the $12,900 accrued vacation pay included in these assets was from his 23-year state police employment, 16 years of which predated the marriage.
The court also notes that the husband purchased a used Plymouth van for the wife, which she recently traded in for a 1994 Dodge van which has an equity of $7,000. The wife also obtained $1,700 from a joint account which she used for her dog grooming school tuition and expenses. Also, neither party listed on their financial affidavits 44 U.S. Savings Bonds with face value of $50 each, purchased by the husband through payroll deductions. No present value was given for these bonds.
The court finds that the husband made substantial economic and monetary contributions to the marriage and to the accumulation of assets owned by the parties which also appreciated by growth and/or addition. The wife also made some economic contributions which were far outweighed by those of the husband's. At the same time, she made substantial non-monetary contributions which the court recognizes, as it must. See O'Neill v. O'Neill, 13 Conn. App. 30, cert. denied, 207 Conn. 806
(1988).
The court further finds that the husband has a far greater earning capacity and earning ability than that of the wife, and has substantially greater potential to acquire capital assets and income in the future than she has.
While the court believes that the wife may have done more to solidify and realize her plan to become self-employed as an owner-operator of a dog grooming `salon', than she already has, the court also considers the uncertainty in her future created by the pendency of this litigation. It also appears that the family dwelling, as situated in a rural agricultural residence zone on a state highway in a bucolic town would be ideally situated for a dog grooming salon, and would require little structural or substantive renovation, which could be accomplished at modest cost.
Although the court recognizes the husband's significant monetary and personal contributions to the family dwelling, and his affinity for it, the court concludes that it would be the better approach to vest title in the home to the CT Page 65 wife, which would enable her to have the opportunity to start her own dog grooming business and acquire income and capital assets in the future. The husband, by dint of his income and liquid assets, is better able to obtain another residence. In the event she is unsuccessful in this venture, she has sufficient earning capacity, employability and vocational skills to be self sufficient in another occupation within a reasonable time.
In the light of the above findings, and after consideration of all of the factors in General Statutes 46b-81
and 46b-82, the court orders as follows:
A decree dissolving the marriage on the ground of irretrievable breakdown may enter.
The husband shall transfer by quit claim deed to the wife all his right, title and interest in and to the jointly-owned family dwelling at 488 Trumbull Highway (Route 87), Lebanon, Connecticut, to the wife. She shall save him harmless from the first mortgage and real estate taxes thereon.
The wife shall simultaneously execute and deliver a promissory note in the amount of $42,000 secured by a second mortgage on the premises, payable with interest at the rate of three (3%) percent per annum. Said note and mortgage shall contain a thirty day default clause, provision for attorney's fees and an increase in the interest rate to five (5%) percent per annum in the event of default, and shall provide: that a default in the first mortgage shall constitute a default of this mortgage; for acceleration in the event of default, and that the husband shall be named as a second mortgagee on the homeowner's insurance policy. If not sooner paid, the unpaid principal and accrued interest shall be due and payable on the first to occur of the following events: wife's death or remarriage or cohabitation under the provisions of General Statutes 46b-86(b), or ceasing to reside there as her principal residence, sale of the mortgaged premises or December 1, 1998. Husband shall also be entitled, while any portion of the principal of wife's mortgage remains unpaid, to a right of first refusal to purchase said premises from the wife. Said right is to be exercised by him in writing within thirty days of the transmittal to him of a copy of a bona fide offer to purchase the premises from a third party. Said right of first refusal shall also require that before the wife offers the property for CT Page 66 sale through a broker or otherwise, she shall first offer the property to him. In the event husband does not match the bona fide third party offer, or December 1, 1998, whichever first occurs, his right of first refusal shall expire and become null and void.
The wife shall also take, have and own the following items of personal property: her 1994 Dodge van; her jewelry; the 44 U.S. Savings Bonds, one-half (1/2) of the cash in the four bank accounts which total about $4,000, making her share about $2,000; all of the miscellaneous furniture and furnishings and appliances at the home (excepting those specifically set out to the husband as set forth), and specifically including two two-seat sofas, and the three-seat blue sofa; a white cocktail table; an end table; an oak kitchen table with six chairs; the queen size brass bed; small desk and sideboard; other small desk and sideboard; the five dogs, cats and pet accessories; the freezer and color TV; the washer and dryer and VCR; four hunt and two stagecoach paintings; the microwave and cabinet; the silverware in the home; one-half (1/2) of: the yard tools, pots, pans, utensils and coins; the four-wheel vehicle, cart and horse equipment.
The husband shall transfer to the wife fifteen (15%) percent of the gross amount of his pension, or about $85.92 per week, which is shown on his affidavit as $572.88 per week, to be accomplished by Qualified Domestic Relation Order (QDRO) or other appropriate instrument. The wife's portion so transferred shall be taxable to her, and the court shall retain jurisdiction over this order to modify the decree for the purpose of compliance with federal and/or state law relating to retirement/pension plans.
The husband shall pay to the wife the sum of $200 per week as periodic alimony for a period of two and one-half (2 1/2) years. Said alimony may be modifiable by husband if he loses his job, but shall be otherwise nonmodifiable as to term or amount. Said alimony and that hereinafter ordered shall terminate upon the death of either party, or the wife's remarriage or pursuant to the provisions of General Statutes46b-86(b), and shall be taxable income to the wife and deductible by the husband.
The husband shall continue to maintain the wife as a beneficiary of his retirement plan health and medical insurance CT Page 67 under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) or General Statutes 38a-538
as applicable for a period of three (3) years, and pay one-half (1/2) of the premium thereof by way of periodic alimony; the wife shall pay the other one-half (1/2) thereof.
The husband shall take, have and own the following items of personal property: the balance of his pension/retirement plan benefits; one-half (1/2) of the joint bank accounts; the Travelers, CNG and Northeast Utilities stock; his Travelers 401K and his Aetna deferred compensation plans; and his Fidelity and Connecticut Mutual IRA accounts; the three-piece sectional sofa, the large oak entertainment center and the master bedroom set; his silver place setting and father's gold watch, his motor vehicles, his state police life insurance policy, and his personal effects, and one-half (1/2) of the coins, pots, pans and utensils and yard tools.
He shall maintain and pay for the present family life insurance policy on their lives, described on his financial affidavit as Connecticut Mutual Life, and clarified in testimony, unimpaired with him as beneficiary on the policy insuring her life until the $42,000 mortgage is paid in full; on the policy insuring his life, with the wife as beneficiary, so long as he is obligated to pay alimony hereunder.
The parties have agreed upon the record to file a joint federal and state income tax returns for calendar year 1993. Husband shall pay the cost of same, and any tax liability, and the parties shall equally share any refund.
The parties shall each pay the liabilities shown on Schedule 3 of their respective affidavits with the exception of the Mastercard bill which shall be split 50/50.
The husband shall pay towards the wife's counsel fees the sum of $1,000 within sixty (60) days, as the court finds that a denial of such fees in toto would undermine the other financial orders herein.
All instruments or documents necessary or incidental to the effectuation of the court's orders shall be executed and delivered within sixty (60) days hereof, and the husband shall vacate the family dwelling on or before March 1, 1994. CT Page 68
Teller, J.