IN RE RAYNA M. ET AL.*
(5612)

DUPONT, C. J., BIELUCH and NORCOTT, Js.

Argued September 29—decision released December 15, 1987

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Jane S. Scholl,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Robert W. Garvey,* assistant attorney general, for the appellant (petitioner).

*Lawrence A. Dubin,* for the appellee (respondent mother).

*Stephen P. Hanchuruck,* for the appellee (respondent father on the first and second petitions).

*Antonio C. Robaina,* for the appellee (respondent father on the third petition).

*David T. Totman,* for the minor children.

BIELUCH, J. This appeal involves three separate petitions to terminate the parental rights of the parents of three children, brought pursuant to General Statutes § 17-43a[1] by the commissioner of the department

---

[1] General Statutes § 17-43a provides in relevant part: "(a) In respect to any child committed to the commissioner of children and youth services in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in the prior commitment proceeding, or an attorney appointed by the superior court on its own motion, or an attorney retained by such child after attaining the age of fourteen may petition the court for the termination of parental rights with reference to such child, including the right to petition the court for the revocation of the commitment of the child. The petition shall be in the form and contain the information set forth in subsection (b) of section 45-61c, and be subject to the provisions of subsection (c) of said section. If a petition indicates that either or both parents consent to the termination of their parental rights, or if at any time following the filing of a petition and before the entry of a decree, a parent consents to the termination of his parental rights, each consenting parent shall acknowledge such consent on a form promulgated by the

of children and youth services (hereinafter DCYS). The three petitions were considered jointly by the trial court. DCYS appeals from that court's denial of the petitions. We find error.

The three petitions filed by DCYS on February 27, 1986 sought to terminate the parental rights of Kathie M., the mother of Rayna M., a daughter aged seven

office of the chief court administrator evidencing to the satisfaction of the court that the parent has voluntarily and knowingly consented to the termination of his parental rights. No consent to termination by a mother shall be executed within forty-eight hours immediately after the birth of her child. A parent who is a minor shall have the right to consent to termination of parental rights and such consent shall not be voidable by reason of such minority. A guardian ad litem shall be appointed by the court to assure that such minor parent is giving an informed and voluntary consent.

"(b) The superior court upon hearing and notice, as provided in sections 45-61d and 45-61f, may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that, with respect to any consenting parent, such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child or that, with respect to any nonconsenting parent, over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child; or (3) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. If the court denies a petition for consent termination of parental rights, it may refer the matter to an agency to assess the needs of the child, the care the child is receiving, and the plan of the parent for the child."

at the time the petitions were filed, Cheyanne K., a daughter aged six, and Brandon K., also known as Brandon M., a son aged two. The petitions pertaining to the girls also sought to terminate the parental rights of their father, Dewayne Mc. The petition on Brandon's behalf also sought to terminate the parental rights of his father, David M.[2] These three petitions alleged essentially identical grounds for the termination of the respondents' parental rights as set out in General Statutes § 17-43a (b).[3] Because Dewayne had consented in writing to the termination of his parental rights with respect to his daughter Rayna, the petition filed on her behalf contained allegations only as to Kathie, her mother. The relevant allegations of each petition being pursued on this appeal were that for not less than one year the parents (1) abandoned each child in the sense that they failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare, (2) failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the children, who were each previously adjudged neglected or uncared for, the parents could assume a reasonable position in each child's life, and (3) had no ongoing parent-child relationship, defined as the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral, and educational needs of a child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.

---

[2] Kathie had claimed that her husband, David, was not Brandon's biological father. A paternity hearing was held at the insistence of David and it was established that he was the boy's legal father because of his marriage to Kathie at the time of Brandon's birth. The boy's birth certificate was subsequently changed to reflect his legal status as the son of David.

[3] See footnote 1, supra.

The state filed with its petitions a termination of parental rights study pursuant to General Statutes § 45-61f (e).[4] The court considered the history of the respondents and children revealed by this study, as well as information contained in various status reports and DCYS files on each child. Rayna was born on September 9, 1978, in Meriden; her sister, Cheyanne, was born on September 5, 1979, in New Haven. The girls are the second and third children of Kathie; an older daughter, Miranda, was born to Kathie on August 6, 1976, and was subsequently adopted. Rayna and Cheyanne are, respectively, the first and second children of Kathie and Dewayne. Both girls have spent much of their young lives in the care of persons other than their parents. Rayna has spent approximately one year in her mother's care and only a few months in the care of her father. For the rest of her life, Rayna has been taken care of by relatives or has been in the custody of the state in a series of varied state supervised foster care facilities and institutions. Cheyanne has spent approximately four years with her mother and eight months with her father. The balance of her life has been spent in the care of relatives, friends and under the supervision of DCYS in foster care homes.

On December 5, 1982, Rayna was adjudged neglected and was committed to the care and custody of DCYS. In December, 1984, Cheyanne was found to be abandoned by her mother and was committed to the guardianship of DCYS.

---

[4] General Statutes § 45-61f provides in relevant part: "(e) (1) The court may, and in any contested case shall, request the commissioner of children and youth services or any child-placing agency licensed by the commissioner to make an investigation and written report to it . . . . (3) The report shall be admissible in evidence, subject to the right of any interested party to require that the person making it appear as a witness, if available, and subject himself to examination."

At the time of Rayna's commitment in 1982, DCYS presented Kathie with expectations regarding her behavior which would be monitored and assessed by DCYS to determine her level of commitment to the ability to have the child returned to her care. These expectations, which were also the bases for the subsequent evaluations of Kathie regarding her daughter Cheyanne and son Brandon, were as follows: (1) maintain regular contact with DCYS; (2) visit each child as often as DCYS permits; (3) participate in counseling; (4) procure adequate housing; and (5) resolve marital problems with David, her husband at the time.

Kathie met none of these expectations. Away from the state for long periods of time while allegedly driving trucks or accompanying a truck driver friend, her contact with DCYS was sporadic, and her communications or visits with her children were random at best. Kathie stopped participating in counseling in October, 1983, and her relationship with her husband remained unstable. Kathie left the state in April, 1985, to live in Arkansas with a boyfriend but, as of the date the termination petitions were filed, had apparently not divorced David, her husband. Prior to the filing of the termination petitions, Kathie had expressed a desire to have her children come to Arkansas to live with her and her boyfriend. DCYS initiated a home study through the Interstate Compact and it was discovered that this Arkansas home was no longer existing as Kathie and her boyfriend had separated and she was about to move.

The girls' father, Dewayne, had provided no financial support for the care of his daughters, and had had no contact with DCYS regarding their well being from June, 1981, until August, 1984, when he contacted DCYS and requested that both girls be allowed to live with him, his wife Peggy Mc., and their two children in New Hampshire. In December, 1984, Cheyanne, who

was under the guardianship of DCYS, went to live with her father and his family; Rayna joined her younger sister in March, 1985. This was not a successful placement for either child. Rayna returned to Connecticut on June 29, 1985; on July 11, 1985, Dewayne signed and acknowledged a statutory written consent to the termination of his parental rights with respect to this child. Cheyanne returned to Connecticut on August 29, 1985, but no written consent to the termination of his parental rights as to her was executed by him. Dewayne has had no contact with either child since their return to Connecticut.

Brandon was born on August 21, 1983. He is the fourth child of Kathie and the first and only child of the marriage union of Kathie and David. Brandon was placed in a foster home in July, 1984, after he and his half-sister Cheyanne were found living in filthy conditions which were injurious to their well being. At the time, Brandon was in his father's care and Cheyanne was in the care of a female friend of the family. Kathie was then reportedly on the road, driving a truck. Brandon was committed to DCYS on December 7, 1984, for eighteen months. Following Brandon's commitment to DCYS, David expressed a desire to make a home for his son. He was given a list of DCYS expectations and a DCYS worker began to work with him towards reunification with his son. After a hopeful start, David eventually stopped visiting Brandon at the foster home and never found adequate housing for his son. David has not seen his son since September, 1985, nor has he called either the foster home or the DCYS caseworker to inquire about the child's well being.

At the time the termination petitions were filed, on February 27, 1986, all three children were living in separate foster homes. The family with whom Rayna was placed had indicated a desire to adopt her. Permanent homes were being sought for Cheyanne and Brandon.

The legal status and custody of the children remained unstable and chaotic as it had been throughout their entire brief lives.

The trial court found that DCYS had proven neither the allegations set forth in the two separate petitions to terminate the parental rights of Kathie and Dewayne with respect to Rayna and Cheyanne, nor the allegations of the petition to terminate the parental rights of Kathie and David, Brandon's parents. In this appeal from the trial court's subsequent denial of these petitions, DCYS claims[5] that the court erred in finding (1) that the petitioner, DCYS, had not proven that the respondent parents had failed to rehabilitate themselves within the meaning of General Statutes § 17-43a because the court applied a "some future date" standard rather than the "reasonable time" standard required by the statute, (2) that DCYS had not proven that there was no ongoing parent-child relationship within the meaning of General Statutes § 17-43a because the court applied a standard of "no relationship" rather than "no positive relationship" in determining such grounds, and (3) that DCYS had not proven that the parents had abandoned their children within the meaning of General Statutes § 17-43a because the court did not apply the proper test for determining abandonment. DCYS also maintains that the trial court erroneously concluded that the consent of Dewayne to the termination of his parental rights to his daughter Rayna was ineffective. Finally, DCYS claims that the court failed to find certain material facts which were either admitted or undisputed. We agree with the claims made by DCYS and, accordingly, find error in the trial court's denial of the petitions.

[5] The attorney appointed to represent the children in this matter has filed a letter with this court endorsing the position taken by DCYS. Accordingly, no separate brief on behalf of the children has been filed.

I

The statutory standard for the failure to achieve personal rehabilitation is set out in General Statutes § 17-43a. Subsection (b) (2) of that statute provides that the trial court may grant a petition to terminate parental rights if it finds, upon clear and convincing evidence, that "the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that *within a reasonable time,* considering the age and needs of the child, they could assume a responsible position in the life of the child." (Emphasis added.) Prior to the amendment of § 17-43a by No. 83-478, § 1, of the 1983 Public Acts, which became effective on October 1, 1983, DCYS had to prove a greater burden, that the parents had "failed to achieve any such degree of personal rehabilitation as would reasonably encourage the belief that *at some future date* they could assume a responsible position in their child's life." (Emphasis added.) General Statutes (Rev. to 1981) § 17-43a (a) (2).

The trial court denied the DCYS petitions, which were filed on February 27, 1986, under the statutory standard previously applicable to petitions filed prior to October 1, 1983. Relying on the outdated standard of proof, the trial court concluded that "[t]he petitioners in the present petitions have not by clear and convincing evidence demonstrated that the mother Kathie, who spends her time truck driving, will not *at some future date* assume a responsible position in her children's lives."[6] (Emphasis added.) Furthermore, the court

---

[6] The only authority cited by the trial court for its use of the obsolete standard was the case of *In re Juvenile Appeal (84-3),* 1 Conn. App. 463, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984), in which the court reviewed a judgment rendered in 1981 terminating parental rights under General Statutes § 17-43a before its 1983 amendment to the present time standard.

made no findings as to the likelihood that the two fathers, Dewayne or David, would assume a responsible position in the lives of their children at any time or date. " 'Personal rehabilitation' as used in [General Statutes § 17-43a] refers to the restoration of a parent to his or her former constructive and useful role as a parent." *In re Migdalia M.,* 6 Conn. App. 194, 203, 504 A.2d 533 (1986). The unamended statute before October 1, 1983, set "no particular time limit as to when a parent must be able to assume again a responsible position in the life of his or her child. *In re Juvenile Appeal (84-3),* [1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984)]." *In re Migdalia M.,* supra. The amended statutory provision, applicable here, requires proof by DCYS only that the parents of a neglected or uncared for child have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a *reasonable time,* considering the age and needs of the child, they could assume a responsible position in their child's life. As the court so aptly stated in *In re Migdalia M.,* supra, 199, " '[a]t some future date' is quite another test than 'within a reasonable time.' "

The trial court applied an improper statutory standard when considering the claim of DCYS that the parents had failed to rehabilitate themselves within the terms of General Statutes § 17-43a. "Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to the statutory standards. See *In re Juvenile Appeal (Anonymous),* 181 Conn. 638, 640, 436 A.2d 290 (1980); *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 671, 420 A.2d 875 (1979)." *In re Migdalia M.,* supra, 203.

## II

Although the dispositive issue on appeal is the trial court's erroneous application of the former "some future date" standard, rather than the "reasonable time" standard now required by General Statutes § 17-43a when determining whether the parents had rehabilitated themselves within the meaning of the statute, the additional claims made by DCYS may arise upon the rehearing of the petitions. These claims will, therefore, be addressed to facilitate these proceedings. *Loewenberg* v. *Wallace,* 147 Conn. 689, 694, 166 A.2d 150 (1960); W. Maltbie, Connecticut Appellate Procedure § 341.

Each petition alleged as an additional ground for termination of parental rights the provision of General Statutes § 17-43a (b) (4) which provides that the trial court may terminate parental rights where "there is no ongoing parent-child relationship [for a period of one year], which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." The trial court denied the termination petitions on this ground as well.

The trial court, in considering this ground, found that the children were affectionate towards their mother, but showed anger at her for running off with truck drivers. The court noted that some relationship existed between Rayna and her mother, although Rayna is not bonded to her. The court also found that both girls had strong feelings towards their mother, although, the court added, these feelings may be negative. As to the fathers, the court noted that until September of 1985,

when he dropped out of sight, David had had a good relationship with Brandon. The relationship of Dewayne to his daughters Rayna and Cheyanne was less clear to the court, although it noted that while Cheyanne was living with her father and his family in New Hampshire she felt bonded to them. The court thereupon denied the petitions on its finding that DCYS had failed to establish that no ongoing parent-child relationship existed between the respondent parents and their respective children.

The court's analysis of this ground as a basis for the termination of the respondents' parental rights was based, however, on the dissenting opinion of Justice Parskey in *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 648, 436 A.2d 290 (1980). The quoted language on which the court relied states in pertinent part: "It is not enough for the [DCYS] commissioner to show a troubled relationship or even no meaningful relationship. Parental rights may be terminated only by showing no relationship." Id. The majority opinion in that case set forth that " '[i]t is reasonable to read the language of "no ongoing parent-child relationship" to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feelings *for* the natural parent.' " (Emphasis added.) Id.; see *In re Juvenile Appeal (84-3)*, supra, 479.

In *In re Juvenile Appeal (84-6)*, 2 Conn. App. 705, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985), this court rejected the argument that even a negative relationship, such as was referred to in Justice Parskey's dissenting opinion cited by the trial court, was sufficient to overcome a claim of no ongo-

ing parent-child relationship. Our court there held that "in applying [the] definition [of no ongoing parent-child relationship] to the facts of [a] case, we focus on 'the ultimate question [of] whether the child has no present memories or feelings *for* the natural parent.' . . . Common sense and the avoidance of bizarre results dictate that we read that language in its ordinary meaning. . . . As used here, 'for' means 'what is said or felt in favor of someone or something: pro.' Webster, Third New International Dictionary. We must conclude, therefore, that the phrase 'feelings for the natural parent' refers to feelings of a positive nature." *In re Juvenile Appeal (84-6),* supra, 709.

The trial court erred when it relied on the existence of negative feelings on the part of the children towards their mother, as well as the existence of some past relationship between the fathers and their children, to defeat the DCYS claim that there has been no ongoing parent-child relationship for at least one year in each case. "A conclusion of the trial court cannot stand if an erroneous legal standard or rule of law was applied. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980); *University of Hartford* v. *Hartford,* 2 Conn. App. 152, 157, 477 A.2d 1023 (1984)." *Phillipe* v. *Thomas,* 3 Conn. App. 471, 476, 489 A.2d 1056 (1985).

## III

The petitions filed by DCYS also allege that Cheyanne and Brandon have been abandoned by their parents and that Rayna has been abandoned by her mother. Rayna's father, Dewayne, consented to the termination of his parental rights with respect to her. General Statutes § 17-43a (b) (1) provides that the trial court may grant a petition to terminate parental rights if it finds, upon clear and convincing evidence, that for not less than one year "[t]he child has been abandoned

by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.''

"Abandonment focuses on the parent's conduct. It is a question of fact for the trial court 'which has the parties before it and is in the best position to analyze all of the factors which go into the ultimate conclusion that [the statutory standard of abandonment] has been satisfied.' *In re Adoption of Webb,* 14 Wash. App. 651, 657, 544 P.2d 130 (1975)." *In re Juvenile Appeal (Docket No. 9489),* 183 Conn. 11, 14, 438 A.2d 801 (1981).

The trial court found that any contact Kathie had with her children was sporadic at best, and was usually in the form of infrequent phone calls. In 1985, Kathie sent cards to the children on their birthdays. After leaving the state in April of that year, Kathie visited each child briefly in December, 1985, and in February, 1986, before leaving the state again. The court also found that as of January, 1986, Dewayne's whereabouts were unknown, and that David had dropped out of sight in September, 1985.

The trial court concluded that DCYS had failed to establish by clear and convincing evidence that Brandon had been abandoned by his parents, Kathie and David. The court made no specific finding as to the abandonment of either Rayna or Cheyanne by Kathie or Dewayne, other than to state generally that "[t]he petitioner has failed to demonstrate by clear and convincing evidence the grounds alleged in the petitions pertaining to Cheyanne K. or Rayna M. for termination.''

The trial court applied an improper test for determining abandonment within the meaning of General Statutes § 17-43a (b) (1). The statutory standard is not whether the parents have shown *some interest* in their children. Common sense dictates that a parent's obli-

gations toward his or her child go further than a minimal interest. From the recital of the facts before the court and the parents' course of conduct, it is apparent that neither Kathie nor Dewayne nor David manifested any reasonable degree of interest, concern or responsibility as to the welfare of their respective children.

" 'The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.' " *In re Juvenile Appeal (Docket No. 9489),* supra, 15, quoting *In re Adoption of Webb,* supra, 653.

It is not lack of interest alone which is the criterion in determining abandonment. Abandonment under General Statutes § 17-43a (b) (1) requires failure to maintain "interest, concern or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of 'interest, concern or responsibility' for the welfare of a child. *In re Luke G.,* 40 Conn. Sup. 316, 323, 498 A.2d 1054 (1985). Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred. *In re Juvenile Appeal (Docket No. 9489),* 183 Conn. 11, 438 A.2d 801 (1981)." *In re Migdalia M.,* 6 Conn. App. 194, 208–209, 504 A.2d 533 (1986).

General Statutes § 17-43a (b) (1) does not contemplate a sporadic showing of the indicia of "interest, concern or responsibility for the welfare of a child." A

parent must maintain a reasonable degree of interest in the welfare of his or her child. " 'Maintain' implies a continuing, reasonable degree of concern." *In re Migdalia M.,* supra, 210.

It was clearly erroneous for the trial court to find that the respondent nonconsenting parents had not abandoned their children within the terms of General Statutes § 17-43a (b) (1). The "minimal" interest of the parents found by the trial court was insufficient to overcome the proof of abandonment established by DCYS. The conclusion of the trial court on the issue of abandonment cannot stand. *Phillipe* v. *Thomas,* supra.

## IV

The petition to terminate the parental rights to Rayna alleged that her father, Dewayne, had consented to the termination of his parental rights. The trial court found this consent "ineffective . . . since his consent is dated July 11, 1985" and the petition to terminate was "filed February 27, 1986." The court apparently believed that the consent was ineffective because it was executed prior to the filing of the petition.

General Statutes § 17-43a (b) provides that the trial court may grant a petition to terminate parental rights if it finds that "with respect to any consenting parent, such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child . . . ." Section 17-43a (a) provides that "[i]f a petition indicates that either or both parents consent to the termination of their parental rights, *or* if at any time following the filing of a petition and before the entry of a decree, a parent consents to the termination of his parental rights, each consenting parent shall acknowledge such consent on a form promulgated by the office of the chief court administrator evidencing to the satisfaction of the court that the parent has voluntarily and knowingly consented to the termina-

tion of his parental rights." (Emphasis added.) By the terms of this statute, consent may be given in the alternative before or after the filing of a petition.

It is clear from the language of § 17-43a (a) that a petition may indicate the prior consent of a parent to termination if that is the case. Execution of a consent form prior to the filing of a petition is therefore not precluded. In fact, prior consent is also recognized as an appropriate course by the contents of form JD-JM-40, "Petition for Termination of Parental Rights."

The record in this case contains Dewayne's consent on the form promulgated by the office of the chief court administrator, form JD-JM-60, conforming to the requirements of § 17-43a (a). The form is signed by Dewayne and acknowledged before a notary who indicated (1) that the form was signed by Dewayne in his presence after Dewayne had read it, and (2) that Dewayne stated that he understood the contents of this consent. The form evidences that Dewayne "voluntarily and knowingly consent[ed] to the termination of [his] parental rights," and provides the court with the basis for a finding of voluntary and knowing consent as required by the statute.

The consent obtained from Dewayne regarding the termination of his parental rights to his daughter Rayna was in conformance with the requirements of § 17-43a (a). The trial court erred in finding it ineffective.

## V

DCYS maintains also that the trial court erred in failing to consider certain material facts which were either admitted or undisputed by the parties. Although the "finding" by the court has been abolished, a party may still attack the factual basis of the court's decision as

failing to include material facts that are admitted and undisputed by the parties. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra, 222 n.5.

Inasmuch as we conclude that the trial court erred in denying the three separate petitions for termination of parental rights and that a rehearing will be required at which this claim of evidentiary error is not likely to recur, we therefore decline to review this issue.

There is error, the judgment is set aside and the case is remanded for a rehearing.

In this opinion the ther judges concurred.