MEMORANDUM OF DECISION
This case involves an application for the termination of the parental rights of Thomas B. to his daughter, Ashley E., who is eleven years old. On December 21, 1993, Ashley's mother, Elena E., filed this application in the Probate Court, pursuant to Connecticut General Statutes § 45a-715, et seq. On April 10, 1995, the probate court terminated the parental rights of Thomas B., having found he had abandoned the child and engaged in acts of omission or commission. (Meyer, J.) This termination order was timely appealed to the Superior Court for Juvenile Matters.
This appeal presents a trial de novo of the issues presented to the court regarding termination of the father's rights. The application filed by the mother, Elena, alleges that the child was abandoned by her father and that she has been denied the care, guidance, or control necessary for her physical, educational, moral or emotional well-being as a result of acts of parental commission or omission, pursuant to Connecticut General Statutes § 45a-717(g)(A) and (B).[2]
The court finds that the father has appeared and has a court appointed attorney. The appeal was taken in a timely fashion and in accordance with the statutes. Further, proper notice was served on all parties. The court concludes that it has jurisdiction in this matter and there is no pending action affecting custody of Ashley in any other court.
FACTS
The court, having heard three days of testimony from the mother, father, a social worker from the Department of Children and Families ("DCF"), Attorney James G., Professor Catherine C., and Robert L.; as well as having reviewed all of the exhibits received into evidence and considered the documents which the parties requested the court take judicial notice of, makes the following findings by clear and convincing evidence: CT Page 15067
Ashley was born on April 22, 1988. She has severe developmental delays and has been labeled mentally retarded by her pediatrician. She has just learned to write her first and last name and attends a special education program in Bridgeport. By all accounts she is a very happy and affectionate child. Since she was six weeks old she has lived with her mother and maternal grandparents who have provided her with a safe and comfortable home. Her mother has been exclusively responsible for making sure that Ashley has received the therapy and medical care that she has needed since she was born.
Elena and Tom met in the summer of 1987 and dated for several months at which time Elena discovered she was pregnant. In October of 1987 they moved in together. While Elena was pregnant Tom was using both heroin and cocaine on almost a daily basis. While initially they shared paying the rent, by the end of 1987 Tom had stopped contributing his share and was using both his and part of her income to pay for drugs. By April of 1988 Tom had lost his job. Tom continued to use drugs after Ashley was born. In fact he used drugs at the hospital while Elena and Ashley were in the maternity ward.
After Tom and Elena went home with the baby, they were faced with an eviction notice for failure to pay the rent. In May of 1988, Elena called the police because Tom was drunk and disorderly. While Elena was holding the baby and waiting for the police, she realized that Tom was overdosing on drugs. She then contacted an ambulance which took Tom to a hospital.
On another occasion, Ashley began crying and Tom refused to let Elena go to comfort the child. Instead, he got out of bed and came back with a carving knife whereupon he stabbed the bedding to keep Elena from going to the baby. Finally, while they were all still living together, Elena refused to give Tom a ride in the car. He then grabbed the baby out of her car and ran down the street with the baby still in her carseat. The police later found him and the baby at his parents' home two miles away.
Elena decided to move home with her parents when Ashley was approximately six weeks old. On June 9, 1988, Tom voluntarily signed a stipulation giving custody of the child to Elena.
Elena obtained a restraining order on June 17, 1988. Despite this order, Tom and Elena continued to see each other, with Ashley, on approximately a weekly basis. CT Page 15068
Tom spent a brief period in jail between September 7, 1988 and September 23, 1988 and again between October 27, 1988 and January 31, 1989. In 1989, Tom's incarceration periods began to increase as follows:
 5/15/89-8/30/89 incarcerated 10/25/89-7/13/90 incarcerated 10/2/90-1/28/91 incarcerated 2/6/91-4/2/91 incarcerated 9/13/91-2/29/92 incarcerated 5/18/92-6/25/93 incarcerated 10/04/93- present incarcerated
As can be seen from the above incarceration record, Tom did have periods between Ashley's birth and the filing of the petition on December 21, 1993, when he was not incarcerated and employable. Tom testified that he was a talented worker who could find jobs when he was not in jail. Despite this admission, Tom only paid a total of $450.00 in child support for this child between April 22, 1988 and December 21, 1993. This is despite the fact that on August 29, 1990 he entered into a stipulation which was never modified to pay $150 in support for August 1990, $200 for September 1990 and $300 per month beginning on September 29, 1990. He also never paid for any medical bills or services which included corrective eye therapy, physical therapy, speech therapy and occupational therapy.
What Tom did do while he was incarcerated was repeatedly write Elena and request information regarding Ashley. He also sent cards addressed to Ashley. He did not attempt to write Ashley when he was not incarcerated.
Tom also sought visitation with Ashley for the periods of time when he was not incarcerated. On August 29, 1990 the parents entered into a stipulation that provided for supervised visitation twice a month. It is important to note that from August 29, 1990 until December 23, 1993 there was no restraining order in place and Tom was out of jail for approximately eleven months. While there is some dispute about the exact number of visits Tom actually had, the court finds that his own attorney's testimony was credible in this regard and that he only had a couple of visits during this entire period. Tom did not see Ashley after 1991. CT Page 15069
ADJUDICATION
The court finds by clear and convincing evidence, that as of December 21, 1993, Ashley had been abandoned in the sense that her father has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Connecticut General Statutes § 45a-717(g)(A).
The court is well aware that a parent's imprisonment alone does not constitute abandonment. In re Juvenile Appeal (Docket No. 10155), 187 Conn. 431, 443 (1982). Instead the court focuses primarily on the evidence surrounding Tom's conduct during the periods of time he was not incarcerated in 1988, 1989, 1990, 1991, 1992 and 1993.
There are five general obligations of parenthood: "(1) express love and affection for the child, (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile, (5) the duty to furnish social and religious guidance." In reJuvenile Appeal (Docket No. 9489), 183 Conn. 11, 15 (1981); In reMichael M., 29 Conn. App. 112, 121 (1992).
While Tom did express love and affection for his child and express personal concern over her health and well-being while he was incarcerated, he only had a couple of visits and did not attempt to write Ashley during the periods of time he was not incarcerated. He also did not fulfill the other three obligations expected of a parent. Even when he was not incarcerated he did not provide the necessary food, clothing or medical care to sustain this child's well-being. A total payment of $450.00 is obviously a gross derogation of this responsibility. A showing of sporadic interest or responsibility for a child is insufficient to defeat a claim for abandonment. In re Rayna M.,13 Conn. App., 36,38 (1987). During the trial Tom conceded that, on the rare occasions that he did provide food or clothing during the first six weeks of Ashley's life, he stole the money used to purchase these items. Tom has never provided a domicile for Ashley. While the family was living together, no rent was paid and the family was facing eviction. Tom has never provided any social or religious guidance to this child and certainly has not provided a positive role model as a result of his substance abuse and incarceration history. After carefully considering the foregoing facts, the court finds by clear and convincing evidence that Tom CT Page 15070 has failed to maintain a reasonable degree of interest, concern or responsibility for Ashley.
The court finds that petitioner has not proven that Ashley has been denied, by reason of acts of parental omission or commission, the care, guidance or control necessary for her physical, educational, moral and emotional well-being as set forth in Connecticut General Statutes § 45a-717(g)(2)(B). The court cannot conclude this child has suffered serious emotional or physical injury. In re Kelly S., 29 Conn. App. 600, 614
(1992). Ashley has the care of a mother who loves her and her father did not stand in the way of the development of this bond.
REQUIRED FINDINGS
With respect to the mandatory factual findings required by Connecticut General Statutes § 45a-717(h):
1. The timeliness, nature and extent of services offered, provided and made available to the parent and child by a child placing agency to facilitate the reunion of the parent with the child;
Since no agency has been involved with this family, no such finding can be made.
2. The terms of any applicable court order entered into and agreed upon by any individual or child placing agency and the parent and the extent to which all parties have fulfilled their obligations under such order.
Tom has not fulfilled his stipulated child support agreement.
3. The feelings and emotional ties of the child with respect to the child's parents.
Ashley is closely bonded with her mother. She has not seen her father since 1991.
4. The age of the child.
Ashley is eleven years old.
5. The efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best CT Page 15071 interests of the child to return the child to the parent's home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with parent, provided that the court may give weight to incidental visitations, communications or contributions and the maintenance of regular contact or communication with the guardian or other custodian of the child.
Tom has maintained written regular contact with the mother and has attempted to send cards to Ashley while he was incarcerated.[3] He has not seen the child since 1991.
6. The extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act of any other person or by the economic circumstance of the parent.
Tom through his own voluntary choices and acts has been incarcerated for the majority of Ashley's life. Given the child's cognitive limitations, the father's severe substance abuse and illegal conduct when he was not incarcerated, and Tom's failure to provide support, this court cannot find that the mother engaged in unreasonable conduct by not providing the child with the cards her father sent to her.
DISPOSITION
In a termination of parental rights case, the court must first determine whether the grounds for termination of parental rights have been proven by clear and convincing evidence. Only after this step has been completed, can the court consider what disposition is in the best interests of the child. The need to separate the evidence in a termination of parental rights case into two phases, those facts supporting adjudication and then those facts bearing on the appropriate disposition, has been repeated often by our courts. "Our statutes and case law make it crystal clear that the determination of the child's best interests come into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence." In re Valerie D., 223 Conn. 492, 511
(1992).
Tom is not seeking custody of Ashley. Instead, he is asking the court to not terminate his parental rights so that he can CT Page 15072 engage in some type of visitation with her. This is a case that turns upon the question of Ashley's best interests. The court took no expert testimony about whether it is in this child's best interest emotionally to have no relationship with her father or whether a relationship may be appropriate under certain circumstances and with certain safeguards in place. While there is no question that it is in Elena's best interest to not have any further dealings with Tom, this is not the standard to be applied in reaching a disposition. Likewise, the standard to be applied is not whether Tom "deserves" to see Ashley based on his past history of abandoning the child. Instead, this court must only consider what is in Ashley' s best interest. Accordingly, pursuant to Connecticut General Statutes § 45a-717(d) the court finds that reasonable cause exists to warrant an examination of Ashley and a clinical evaluation of Tom by a licensed clinical psychologist to assist the court in ruling on the merits of the petition. The court on its own motion reopens the trial for purposes of ordering the evaluations completed and provided to the court so that it can consider them in reaching its decision regarding disposition of this case. After the evaluations are completed, the parties in accordance with the attached procedures may contact the evaluator. The trial will then be continued for the sole purpose of examination of this evaluator.
It is so ordered.
CHASE T. ROGERS, JUDGE CHILD PROTECTION SESSION