MEMORANDUM OF DECISION
After spending all of her life in foster care, Katherine C., born April 1998, daughter of Danielle P., biological mother, and Andre B., putative father, became the subject of a petition filed by the Commissioner of the Department of Children and Families (DCF) seeking to terminate her parents' rights so that she may be freed for permanent home in adoption.
The petition alleges the statutory grounds for termination of Danielle P.'s rights of failure to rehabilitate and no ongoing parent child relationship, defined in General Statues § 17a-112 (c), and as to Andre B. the statutory grounds of abandonment and no ongoing parent child relationship also defined in General Statutes § 17a-112 (c).
Termination of parental rights proceeds in two stages: adjudication and disposition. In the adjudicatory phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the CT Page 10980 filing of the petition or last amendment to it. In re Joshua Z.,26 Conn. App. 58, 63, 597 A.2d 842 (1991), cert. denied 221 Conn. 901
(1992). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest.
Procedurally, the evidence as to both adjudicatory and dispositional phases is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979); In re Juvenile Appeal (84-BC), 194 Conn. 252, 258,479 A.2d 1204 (1984); In re Nicolina T., 9 Conn. App. 598, 602,520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); In reEmmanuel M., 43 Conn. Sup. 108, 113, 648 A.2d 904 aff'd 35 Conn. App. 276,278, 648 A.2d 881, cert. denied, 231 Conn. 915, 648 A.2d 151 (1994). For the reasons stated below, the court grants the petition to terminate the parental rights of Danielle P. and Andre B.
 I FACTUAL FINDINGS
At trial, DCF introduced sixteen documentary exhibits and the testimony of Wendy Blake, DCF social worker, Eric Robinson, counselor from Catholic Family Services, Mary E., foster mother, Jane Pertillar, DCF social worker, Kathy Hustek, DCF social worker, and Robert Freedman, psychologist. The mother introduced three documentary exhibits and the testimony of Wendy Blake, DCF social worker, Lisa Peter, the respondent's aunt, as well as her own testimony.
The credible and relevant evidence offered at trial supports the findings of the following facts by clear and convincing evidence.
A. Procedural History
On April 1998, DCF invoked a 96 hour old on the child Katherine C., who was only two days old. On April 24, 1998, DCF filed a petition alleging that the child would be neglected in that she would be permitted to live under conditions, circumstances or associations injurious to her well being and also that the child was uncared for in that she would be homeless and the child's home could not provide the specialized care which the physical, emotional or mental condition of the child requires. The petitioner also sought and was granted an order of temporary custody. Katherine was adjudicated neglected and uncared for on August 5, 1998, and committed to the Commissioner of the Department of Children CT Page 10981 and Families. (Cone, J.) At that hearing the named father, Tyron C., was excluded by genetic testing and removed from the case. Written expectations were set on that date for Danielle (who herself was committed to DCF) and approved by the court as follows:
 (1) Keep all appointments set by or with DCF, keep whereabouts known to DCF or your attorney
(2) Visit the child as often as DCF permits
(3) Participate in counseling: Parenting, individual, and family planning
(4) No substance abuse
(5) No involvement with the criminal justice system
 (6) Resume school in the fall; accept DCF placement and cooperate with services.
The written expectations form was signed by Danielle, her attorney and the child's attorney on August 5, 1995. This form included the following written advisement:
 "If you fulfill the court's expectations, you will improve your chances of regaining or permanently keeping custody of your child. Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption. If you need help in reaching any of these expectations, contact your lawyer and/or DCF worker."
At the extension hearing on August 3, 1999, the court granted the extension of the commitment and approved the permanency plan of termination of parental rights and adoption. The court also found that continuing efforts to reunify the child and the mother and the father were no longer appropriate, and made that finding by clear and convincing evidence. (Keller, J.) The court ordered the termination petition to be filed by September 7, 1999. This petition was filed on September 9, 1999.
The mother filed a petition for revocation of commitment on May 4, 2000, and at the extension hearing held on June 6, 2000, the court continued the motion until the trial date set for the termination CT Page 10982 petition and granted the extension of the commitment until further order of the court. (McMahon, J.)
The trial on the termination petition was heard together with the mother's petition for revocation of commitment and was scheduled for two days. On the first day of trial, the mother did not appear and her counsel requested that the trial be continued, although counsel stated that the mother was aware of the trial date. Since the trial had been continued three times, the court commenced the trial without the mother present. The mother was represented by her court appointed counsel.[2]
The mother did appear, however, on the second day of the trial.
The putative father, Andre B., was later named by the mother after Tyron C. was excluded, but did not appear at any of the hearings including the trial. Service was found by publication and a default entered against him.
The trial was held on two days. At the end of the trial, counsel for the mother requested an opportunity to file post trial briefs which request was granted by the court. The court was later presented with an ex parte motion for a transcript of the proceedings by the counsel for the mother in order for her to properly prepare her brief. The court granted this request. The transcripts were not completed and distributed until almost nine months after the completion of the trial. The court then held a hearing to set forth the dates for the filing of the briefs. The counsel for the mother filed her brief, however the assistant attorney general representing DCF elected not to file a post trial brief.
B. The mother. Danielle P.
Danielle P. was born on November 11, 1981, and at the age of four was placed with a foster family due to her biological mother's chronic substance abuse. At the age of six, she was adopted by her foster mother and continued to live with her until April, 1995, when her adoptive mother asked for her removal and signed a voluntary placement agreement with DCF. Danielle continues to be estranged from her adoptive mother and family due to conflicts. She was familiar with her biological mother who died in 1992 from a life debilitating illness and has had contact with her biological father who she reports is also dying from a life threatening illness. Danielle's biological family has a significant history of both alcohol and drug abuse.
From the time of her voluntary placement in 1995, Danielle's history is replete with runaway and out of control behavior. She was charged with truancy and out of control behavior and adjudicated a delinquent child CT Page 10983 because of violations of court orders. Although she was ordered to cooperate with DCF arranged placements, she ran away from the placements and failed to appear for further court hearings with regard to her delinquency behavior.
She attended Weaver High School until the spring of 1998 at which time a decision was made out of a planning placement team meeting that she be transferred to adult education. She started the program in the fall of 1998, but never completed the classes. She enrolled herself into Weaver High School the following fall, however was discharged due to her oppositional behavior and failure to follow directives. She was allowed to continue at Weaver High School and be transferred to Hartford High, but the principal at Hartford High decided that she should be transferred to Hartford Adult Education due to her age.
Danielle has two other children besides Katherine. Her oldest child, Raekwon, resides with his paternal grandmother who was granted guardianship by probate court, and Jayell, born after Katherine, is committed to DCF and resides with in a DCF foster home.
Although she herself was a committed child at the time of Katherine's birth, one of the presenting problems was Danielle's homelessness. From the date of the voluntary placement m 1995, she has been in 25 DCF placements. Many of the offered placements she has refused, particularly shelter placements. During much of the this time, Danielle has been whereabouts unknown and has an extensive history of transience. From the time of Katherine's birth, Danielle has lived with various friends and family and always had a bed to sleep in which she has found on her own. She did accept two DCF shelter placements, but failed to maintain herself long enough in the shelters for DCF to make permanent plans for her. In August, 1998, she contacted DCF to find a placement for her in the hopes Katherine could be placed with her and after only two days at the shelter while awaiting the foster placement, she ran away because she did not feel she was getting enough help there. (Exhibit O.)
Since its involvement, DCF referred Danielle to individual counseling after the birth of Katherine, however she did not complete the program. Eric Robinson saw her on two occasions and found her attitude toward counseling to be negative. On the third meeting, Danielle failed to attend and when Robinson finally spoke to her, she said she would return when her personal schedule became more flexible. Although she acknowledged that she needed counseling in certain matters, she also believed that the counseling was causing her more stress. Referrals were also made for parenting classes and on both occasions her case was closed due to her not following through and attending the classes. CT Page 10984
Danielle's visits with her daughter have been inconsistent. During one period in 1999, she failed to visit with Katherine for almost two months at a time when her whereabouts were unknown to DCF. The arrangement was then made for weekly visits which Danielle would have to confirm prior to the visit. Since that time, she has attended only about 50 percent of the scheduled visits. (Exhibit E.)
Pursuant to court order, Dr. Freedman evaluated Danielle and her interaction with her child on two separate days. He found her to be energetic and strong-willed and had avoided structure and adult authority throughout a lengthy series of placements. She described herself as seeming to develop relationship problems in any home she found herself in, and eventually runs away or is expelled. She exhibited signs of history of personality problems.
Perhaps one of the most telling statements about Danielle was made in Freedman's psychological evaluation and best describes Danielle. "Danielle [is] herself a child needing placement." (Exhibit O.) In fact, Freedman opined in his evaluation that Danielle would have to prove her ability to settle down and remain in a placement for at least six months before any consideration would be given to placing Katherine with her. "Danielle's chances of succeeding in a foster placement were very limited. She was demanding, difficult, impulsive, and had very little tolerance for frustration." (Exhibit O.)
Freedman's evaluation was performed almost two years from the start of the trial. When given the facts of what Danielle had done and not done during those almost two years, he was not surprised that she did not follow through on his recommendations. Her potential for rehabilitation would be minimal at this point due to her lack of follow through during the last two years.
During the interactional portion of the evaluation, Freedman observed that despite the mother's claim of regular visiting, the baby had absolutely no comfort or familiarity with her, turned away and cried angrily in her presence, and looked vigilantly for her foster mother until she finally exhausted herself and fell asleep. In fact, he found there to be a negative relationship between the mother and the child because of Katherine's active avoidance of her mother. Although acknowledging babies are different with ranges of emotions, the relationship between Katherine and Danielle, Freedman placed on the worse end of the range. Katherine acted like Danielle was a stranger. He had expected more of a bond because of the frequency of the visits prior to the evaluation. He opined this was due to (1) the baby having a strong attachment to someone else; (2) the mother lacked parenting skills that would have allowed her to establish a relationship; and (3) the mother CT Page 10985 and the baby had never established an interaction that would allow for comfort for the baby.
Danielle has failed to follow through with most of her expectations. She has not participated in any form of counseling, did not accept any DCF placement or cooperate with any of the services offered to her by DCF, and does not have any permanent housing. She has failed to visit her child consistently.
C. The child — Katherine C.
Katherine was born on April 1998 and is described as a beautiful, petite, energetic, African American girl. She has remained in the same foster care placement since she was two days old and was discharged from St. Francis Hospital. Now a little over three years old, she is well bonded to her home, which consists of the foster parents, three other children, and an extended family. Mary E., the foster mother, feels very blessed to have Katherine as part of their family and wishes very much to adopt her.
Her visits with her biological mother prior to the interactional evaluation conducted in November, 1998, were on a fairly regular basis occurring one time per week for one hour. The foster mother was clearly the primary parent and Katherine called for her, was attached and bonded to her, and comfortable with her.
According to the Mary E., the foster mother, Katherine would fuss and cry prior to the visits, sometimes stating "I no go see Danielle". Between the visits she does not ask for Danielle or refer to her.
D. The putative father — Andre B.
Andre B. was named as a possible father by Danielle after Tyron C. was ruled out by genetic testing. There is no information about Andre and he was notified of the pendency of this action by publication in The Hartford Courant. Despite several diligent searches to find his whereabouts, DCF has been unsuccessful in locating him. He has never contacted DCF about his daughter and has never been available to this child so that he could develop a relationship with her. He has never sent gifts or cards or offered any support, either monetary or emotional for this child.
 II ADJUDICATION
CT Page 10986
Each statutory basis set out in General Statutes Sec. 17a-112 (b) is an independent ground for termination. In re Baby Girl B., 224 Conn. 263,618 A.2d 1 (1992). The petitioner is required to prove at least one of the grounds alleged in its petition by clear and convincing evidence.
A. Abandonment — General Statutes § 17a-112 (c)(A) as to theputative father, Andre B.
This ground is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. Sporadic efforts are insufficient to negate the claim of abandonment. The test for determining abandonment of a child for purposes of termination of parental rights is not whether a parent has shown "some interest" in his or her child, but rather, whether the parent has maintained any reasonable degree of interest, concern, or responsibility as to the child's welfare. In re Rayna M., 13 Conn. App. 23, 36,534 A.2d 897 (1987).
Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of "interest, concern or responsibility." In re Migdalia M., 6 Conn. App. 194, 209,504 A.2d 533 (1986). From the child's date of placement the father failed to visit or to have any interaction with the child.
 The commonly understood general obligations of parenthood entail these minium attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted. In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122 (1993); In re Roshawn R., 51 Conn. App. 44, 53, 720 A.2d 1112
(1998).
Statutory abandonment on the part of Andre B. has been proven by clear and convincing evidence. He has failed to display any attribute of parental obligation. He has manifested no affection, interest, concern or responsibility whatsoever as to their child's welfare. In re Rayna M.,13 Conn. App. 23, 37-38, 534 A.2d 897 (1987); In re Michael M.,29 Conn. App. 112, 121-123, 614 A.2d 832 (1992). The court finds by clear and convincing evidence that Andre B. has abandoned his child. CT Page 10987
B. Failure to Rehabilitate — General Statutes § 17a-112 (c)(B)— as to the mother, Danielle P.
If the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding fail to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child, grounds for termination exists. General Statutes § 17a-112 (b)(2).
Personal rehabilitation, as used in the statute, refers to the restoration of a respondent to a constructive and useful role as a parent. In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986). The parent's compliance with expectations set after the adjudication of the neglect or uncared for case or the parent's success in fulfilling service agreements entered into with DCF are relevant, but not dispositive, to the rehabilitation finding. In re Luis C., 210 Conn. 157, 167-168,5545 A.2d 722 (1989). The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume the responsibilities of parents than he or she was at the time of the commitment. In re Michael M., 29 Conn. App. 112, 126, 614 A.2d 832
(1992).
Whether the age and needs of the child would support allowance of further time for the parent to rehabilitate must also be considered. Inre Luis C., supra, 210 Conn. 167. The reasonableness of the time period within which rehabilitation is sought to be accomplished is a question of fact for the court. In re Davon M., 16 Conn. App. 693, 696, 548 A.2d 1350
(1988). Also, in determining whether further allowance of a reasonable period of time would promote rehabilitation, a court can consider efforts made since the date of the filing of the petition to terminate parental rights. In re Sarah M., 19 Conn. App. 371, 377, 562 A.2d 566 (1989).
The respondent mother raised the argument that she as a committed child to DCF has been neglected and consequently is the reason why she was not able to properly care for her child. DCF as her "parent" caused her failure to rehabilitate. Through her counsel she continually asked the court to consider facts which occurred prior to the birth of her child as the cause for her failure to adequately rehabilitate herself to the point where she could successfully parent her child. Danielle was not in a better position to parent Katherine at the time of the filing of the petition than she was at the time of her commitment to DCF. This was largely Danielle's own doing. Although Danielle had been failed miserably by her biological parents and no one can determine the damage she may have experienced in her first four years of life raised by substance abusing parents, her complete lack of compliance with any of the services CT Page 10988 DCF offered caused her own inability to even show a shred of evidence that she was moving to a time where she could parent Katherine. The court finds that by clear and convincing evidence that not only has Danielle failed to rehabilitate herself to a point where she can care for Katherine, but given Katherine's age and needs, to wait any longer would be detrimental to Katherine.
C. No Ongoing Parent-Child Relationship — General Statutes §17a-112 (c)(D) as to the mother, Danielle P., and the father, Andre B.
This ground alleged by the petitioner requires proof, by clear and convincing evidence, that there is no ongoing parent-child relationship, which means "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
This statutory definition, as it has been interpreted in case law, requires a finding that "no positive emotional aspects of the relationship survive." In re Jessica M., 217 Conn. 459, 470, 586 A.2d 597
(1991). It is inherently ambiguous when applied to noncustodial parents who must maintain their relationship with their children through visitation." Id., 459; In re Valerie D., 223 Conn. 492, 531, 613 A.2d 748
(1992). Although the ultimate question is usually whether the child has no present memories or feelings for the natural parent, the existence of a loving relationship or a "psychological parent" relationship with one other than the natural parent does not, of itself, establish the no ongoing parent-child relationship ground for termination. In re JessicaM., supra, 473-475.
Unlike the other nonconsensual grounds to terminate parental rights, the absence of a parent-child relationship is considered a "no fault" ground for termination. To establish this ground requires the trial court to make a two-pronged determination. First, there must be a determination that no parent-child relationship exists; and second, the court must look to the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. The absence of a parent-child relationship can be demonstrated in situations where a child has never known his or her parents so that no relationship ever developed between them, or where the child has lost that relationship so that despite its former existence, it has now been completely displaced. In re Juvenile Appeal (Anonymous), 177 Conn. 648,670, 420 A.2d 875 (1979).
Judicial interpretation has imposed a requirement that a child have CT Page 10989 "present memories or feelings" for the parent, and "at least some aspects of these memories and feelings are positive" to overcome this ground. Inre Jessica M., supra, 217 Conn. 475; In re Juvenile Appeal (84-6),2 Conn. App. 705, 709, 483 A.2d 1101, cert. denied, 195 Conn. 801
(1984). The existence of positive feelings usually depends on the viewpoint of the child. In re Rayna M., 13 Conn. App. 23, 35, 534 A.2d 897
(1987). As the Appellate Court recently noted, "the feelings of the child are of paramount importance." In re Tabitha T., 51 Conn. App. 595, 602, ___ A.2d ___ (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id.
The mere fact that there has been some minimal contact between the parent and the child does not preclude a determination that there is no ongoing parent-child relationship. In re Juvenile Appeal (Anonymous), supra, 177 Conn. 638. Dr. Freedman's testimony, as well as Mary E.'s, is more than ample evidence of the sad fact that no such relationship exists between Danielle and Katherine and in fact was termed a negative relationship at the time of the interaction.
The court finds by clear and convincing evidence that no parent-child relationship exists between Danielle and Katherine. Although it may have been difficult given her own commitment status to provide Katherine with the material items a baby needs, Danielle made no effort to take steps which would have enhanced their relationship. She visited on an inconsistent basis, did not complete the expectations the court ordered in order to facilitate the reunion, and did not cooperate with any of the placements and services offered by DCF. Her own actions or inactions are the cause of the failure to establish a relationship.
The court distinguishes this case from In re Valerie D., 223 Conn. 492,613 A.2d 748 (1992), which examined the limited opportunities for forming a parenting relationship that are available to a mother who has lost custody of her newborn baby. Unlike the facts in Valerie D., where co-terminous petitions were filed and at trial the child was only three and one-half months old, here the termination petition was not filed until the child was eighteen months old and ample services had been offered to allow Danielle to develop a parent-child relationship had she been willing and able to avail herself of the services. Katherine herself was able to indicate her own feelings toward Danielle and the focus need not be on the positive feeling of the natural parent. Id., 232.[3]
The court next turns to the question of whether allowing further time for the establishment or reestablishment of such a parent-child relationship would be detrimental to this child's best interests. To allow further time between Katherine and Danielle would be detrimental to the child's best interests. Katherine needs permanency, like all children CT Page 10990 her age. There is no evidence to indicate that Danielle is capable of developing an ability to parent this child or to provide for her needs, both emotional and material. Katherine has been in foster care with the same family since she was two days old. Dr. Freedman has opined that the foster mother is the psychological parent of this child. To remove her from this family would cause her unknown harm. It is important now to continue with this stability rather than redirecting her to an unstable and unpredictable lifestyle.
As to the father, Andre B., the court finds by clear and convincing evidence that no parent-child relationship exists. This was caused by his own inaction and failure to come forward in any way.
 III DISPOSITION
A. General Statutes § 17a-112 (e) Criteria
The court has found by clear and convincing evidence that the necessary statutory grounds alleged by the petitions for the termination of Danielle P.'s and Andre B.'s parental rights have been proven. Before making a decision whether or not to terminate the respondents' parental rights, the court must now consider and make findings on each of the seven criteria set for in General Statutes § 17a-112 (e). In reRomance M., 229 Conn. 345, 355, 641 A.2d 378 (1994).
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent."
Based on the foregoing discussion, the court finds that DCF provided the necessary services to Danielle to facilitate a reunification with her daughter. During her own commitment to DCF, Danielle was offered residential placements which would have allowed her daughter to be placed with her. She either refused or after a very brief stay would leave. DCF offered her assistance with visitation, individual and parenting counseling, educational assistance, and transportation.
As to Andre B., no services were offered due to his failure to ever notify DCF, thus the court finds he was unwilling or unable to benefit from such rehabilitative assistance. CT Page 10991
(2) "Whether the Department of Children dn Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
DCF made reasonable efforts to promote reunification with the mother and her daughter. DCF offered services which Danielle refused both in her daughter's child protection case and in her own. She failed to cooperate. As to the father, no efforts were made due to his unknown whereabouts, and his failure to come forward and seek any relationship with the child On August 3, 1999, when the baby had spent almost 16 months in foster care, the court found by clear and convincing evidence that efforts toward reunification with either parent were no longer appropriate.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations."
Expectations-were never entered on behalf of Andre B. because of his failure to appear in the case. Danielle agreed to and signed expectations on 1998, which were approved by the court. DCF offered her the recommended services but Danielle failed to comply with almost all of her expectations:
(4) "The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties."
Katherine has little if any positive feelings toward her mother. Even after regular visitation up until November 1998, during the interactional evaluation the relationship between the mother and the daughter was a negative one. She does not inquire of her mother during the visits which take place on an inconsistent basis. Katherine does not know her father at all. She is, however, bonded and attached to her foster parents and foster family which whom she had resided by well over two years at the time of trial. She has significant emotional ties to them.
(5) "The age of the child."
Katherine is three years old.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child CT Page 10992 as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (b) the maintenance of regular contact or communications with the guardian or other custodian of the child."
Danielle has made no effort to adjust her circumstances or conduct to allow Katherine to be with her. Danielle could not do the simple task of cooperating with DCF placements in order to have some stability to allow for the reunification. She maintained inconsistent visitation, refused services, and has made no serious or sustained effort to reunify with her daughter. She is nowhere close to achieving the level of personal rehabilitation necessary to effectively provide and care for Katherine.
Andre has been whereabouts unknown and has never contacted DCF regarding his child. That is clear and convincing evidence of his own failure to adjust his circumstances.
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
Danielle did not face any unreasonable interference from any person or from economic circumstances preventing her from establishing or maintaining a meaningful relationship with her daughter. Her inability to care for her child or reunite with her is due to her own actions. Since the time of the child's removal, she was offered the assistance of counsel at state expense. She was offered services both in her case as well as her daughter's which if she had complied would have surely promoted reunification. The father was also not prevented through any act or conduct of any person from establishing such a relationship.
B. Best interests of the child
The court must now address the issue of whether the termination of parental rights is in the best interests of the child. This is part of the dispositional phase of a termination proceeding. In re Valerie D., supra, 223 Conn. 511.
The court must also consider their best interests as to the issue raised by the motion to revoke commitment. As has been held:
 "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that the cause for commitment no longer exits. Once that has been established, the inquiry becomes whether a CT Page 10993 continuation of the commitment will nevertheless serve the child's best interests." In re Cesar G., 56 Conn. App. 289, 292-293, 742 Conn. A.2d 428 (2000).
In this case, there can be no doubt that the cause for commitment still exists. The child cannot be returned to her mother who has not dealt with the issues which led to the child's removal from her care. The court denies the motion for revocation of commitment.
The court finds that neither Danielle P. nor Andre B. is in the a position to care for Katherine in the near future. The foster mother is the person to whom she is attached and she should not be moved and required to form new attachments. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." Inre Juvenile Appeal (84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ."In re Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992). The court concludes, from the clear and convincing testimony, that it is in the best interests of Katherine to have permanency and stability in her life and that it is in her best interests that her parents' right to her be terminated.
 CONCLUSION
Based upon the foregoing findings and having considered all of the evidence, statutory considerations and having found by clear and convincing evidence that grounds exist for termination of parental rights, the court further finds upon all of the facts and circumstances presented, that it is in the child's best interest to terminate the parental rights of Danielle P. and Andre B. Accordingly, it is ordered that their parental rights to the children are hereby terminated.
It is further ordered that the Commissioner of Department of Children and Families is hereby appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for said child and that the Commissioner shall file with the court, no later than thirty (30) days following the date of judgement, a written report toward such permanent placement and file such further reports as are required by state and federal law. The foster parents have expressed a desire to adopt Katherine and the court directs that they be given first consideration in any adoption.
SWIENTON, J. CT Page 10994